[No. 57167-8.   En Banc.   May 23, 1991.]

OLYMPIC STEAMSHIP COMPANY, INC., *Petitioner*, v.
CENTENNIAL INSURANCE COMPANY,
ET AL, *Respondents.*

38

*Skeel, Henke, Evenson & Roberts* and *Eric Richter*, for petitioner.

*Lane Powell Spears Lubersky*, by *Robert L. Israel, Barry N. Mesher*, and *Linda E. Blohm*, for respondents.

DORE, C.J. — Olympic Steamship Company appeals a Court of Appeals decision that the "sistership clause" in its insurance policy excluded coverage of the cost Olympic incurred when it paid its customers for the expense they suffered recalling their product from the market.

We hold that the sistership exclusion does not apply when a third party withdraws the insured's product from the market and that Olympic's defective packaging did not make the packers' canned salmon Olympic's product, for purposes of insurance coverage.

We affirm the trial court.

### FACTS

Olympic Steamship Company operated Salmon Terminals, a warehouse for salmon packers. Olympic received unlabeled cans of salmon from the packers during the fishing season and stored the canned salmon until the end of the season, when the salmon packers executed purchase contracts with their customers. Once the packers executed contracts, they instructed Olympic to label, case, and ship the salmon. The packers provided the can labels and the shipping cartons. Olympic affixed the packers' labels onto the cans and boxed the cans using its own casing equipment.

On May 6, 1985, Olympic discovered that its casing equipment was defective and was crimping .015 percent of the packers' cans of salmon, breaking the seams on the cans. Olympic believed that all of the one-half pound cans of salmon that passed through the caser from the date of its installation, December 6, 1984, through the date Olympic discovered the crimped cans, May 6, 1985, were tainted because of the threat of botulism that the defective cans of salmon presented.

Olympic notified the salmon packers and the National Food Processors Association, which oversees the interests of the salmon industry, of the casing defect. The Association

contacted the Food and Drug Administration (FDA) and summarized the results of Olympic's investigation. The FDA collected samples of the canned salmon. The Association and the FDA tested the sample cans at their laboratories and, based on test results, the FDA ordered a product recall. The FDA required that the packers either destroy tainted cans of salmon or, if the packers had already shipped the salmon to their customers, that they recall the tainted product, unpack and inspect the cans, and then repack and reship undamaged cans.

Some of the packers and their customers threatened to send their canned salmon back to Olympic. Ultimately, the parties agreed that it would be less expensive if the inspection were conducted in the field. The Association and the packers, jointly, conducted a physical inspection of the canned salmon. Olympic did not participate in the field examination of the packers' salmon because "[i]t's not our business." Clerk's Papers, at 118.

After the packers inspected the canned salmon, they demanded that Olympic pay the expenses that they incurred in the recall process. Olympic notified its insurers, including Centennial, of the recall and of the packers' claims, believing that the costs incurred fell within the "completed operations" provision of the comprehensive general liability insurance policy it purchased from Centennial.[1] The insurers, including Centennial, denied coverage of the claims. Olympic paid the packers for the costs they incurred conducting the recall in December 1985.

Olympic filed suit against its insurers, including Centennial, on September 16, 1987. Brief of Appellant app. A. It sought damages representing the cost that salmon packers incurred "uncasing, inspecting, and recasing" the cans of salmon that Olympic labeled between December 6, 1984,

---

[1]The policy Centennial originally issued to Olympic excluded completed operations coverage. Endorsements 10, 12, and 17 deleted the completed operations exclusions in cases of property or bodily injury, so that, effective September 14, 1984, the Centennial policy included completed operations coverage.

and May 3, 1985, and because the packers lost the use of the undamaged cans of salmon until all cans of salmon exposed to the caser had been inspected. Brief of Appellant app. A. Complaint of Olympic. Centennial alleged that exclusion "O", the "sistership clause" in Olympic's policy, excluded coverage for Olympic's claims.[2]

Both Olympic and Centennial moved for summary judgment. The trial court granted summary judgment in favor of Olympic. It also awarded Olympic attorney fees that Olympic incurred settling the packers' claims, settling a claim against the manufacturer of the caser, and obtaining the coverage judgment.

The Court of Appeals in *Olympic S.S. Co. v. Centennial Ins. Co.*, 57 Wn. App. 517, 520-21, 789 P.2d 309, *review granted*, 115 Wn.2d 1001 (1990) reversed and granted summary judgment in favor of Centennial. It found that "[n]othing in the language of the [sistership] exclusion suggests that coverage depends on the source of the withdrawal decision", 57 Wn. App. at 520-21, and that the exclusion, therefore, applied whether Olympic, the insured, or the FDA, a third party, ordered withdrawal of the canned salmon. It also found that, for purposes of the sistership exclusion, the canned salmon was Olympic's "product" and that the salmon was "*work* completed by . . . [Olympic] the named insured". 57 Wn. App. at 525. Olympic appeals here.

### ANALYSIS

A summary judgment motion can be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Wilson v.*

---

[2]Centennial also argued that coverage did not extend because the events out of which Olympic's claim arose did not constitute "property damage" under the policy; there was no "occurrence" triggering coverage under the policy; if an "occurrence" existed, that the "products" and the "completed operations" exclusions in the policy precluded coverage; and that if coverage existed, it was excess coverage that extended only to damages that occurred after February 1, 1985. The Court of Appeals, however, addressed only the "sistership exclusion" issue and petitioner raises only the "sistership exclusion" issue before this court.

*Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). In this case, the material facts are not disputed, but each party contends that, based on the sistership clause in Olympic's policy, it is entitled to summary judgment as a matter of law.

## "SISTERSHIP" EXCLUSIONS AND THIRD PARTY PRODUCT WITHDRAWAL

The Comprehensive General Liability policy that Olympic purchased from Centennial provides, in part, that:

This Company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of

A. **personal injury** or
B. **property damage**

to which this insurance applies, caused by an **occurrence** and the Company shall have the right and duty to defend any suit against the **insured** seeking damages on account of such **personal injury** or **property damage**, . . ..

**Exclusions**

This insurance does not apply:

. . . .
**O.** to damages claimed for the withdrawal, inspection, . . . or loss of use of the **named insured's products** or work completed by . . . the **named insured** or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

**Glossary**

. . . .
"**named insured's products**" means goods or products manufactured, sold, handled or distributed by the **named insured** or by others trading under his name, including any container thereof . . ..

Clerk's Papers, at 18, 20, 33. Exclusion "O" is the "sistership" clause disputed in this case. The term "sistership"

derives from a practice observed in the aircraft industry. *Yakima Cement Prods. Co. v. Great Am. Ins. Co.*, 22 Wn. App. 536, 541, 590 P.2d 371 (1979), *rev'd on other grounds*, 93 Wn.2d 210, 608 P.2d 254 (1980).

> When a defect is suspected to be responsible for an aircraft accident, all other aircraft of that type are grounded pending investigation. The potential damages arising from the loss of use of the sisterships are enormous. The exclusion was originally designed to exclude coverage for damages arising from the defect, other than those arising from the defect in the aircraft that was involved in the accident.

*Charles E. Brohawn & Bros., Inc. v. Employers Comm'l Union Ins. Co.*, 409 A.2d 1055, 1057 n.3 (Del. 1979). The intent of the sistership exclusion is that:

> while the insurance covers damages for bodily injuries and property damage caused by the product that was defective or failed, it was never intended that the insurer would be saddled with the cost of preventing such defects or failures any more than it was intended that the insurer would pay the cost of avoiding the defect in the first place or preventing the first failure if the product had been discovered to be in a defective or dangerous condition before the occurrence.

2 R. Long, *Liability Insurance* § 11.09[3], at 11-99 (1990). The insurer, thus, is not liable for the cost of preventative or curative action taken by its insured. 22 Wn. App. at 542.

Olympic argues that the sistership exclusion does not preclude coverage because, even assuming that the canned salmon is its product, the sistership exclusion does not apply when a third party, other than the insured, withdraws a product of the insured's from the market. Centennial contends that the language of the sistership clause does not expressly limit its application to instances where the insured withdraws its product, therefore, the clause applies whether the insured or a third party withdraws the insured's product from the market.

Although the case law that Centennial cites supports its argument that under the sistership clause in Olympic's

policy "it is immaterial that the withdrawal was not by the insured" (italics omitted), *Commercial Union Assur. Co. v. Glass Lined Pipe Co.*, 372 So. 2d 1305, 1309 (Ala. 1979) (quoting *Hamilton Die Cast, Inc. v. United States Fid. & Guar. Co.*, 508 F.2d 417, 420 (7th Cir. 1975)), only a minority of jurisdictions, the two cited, embrace this position. The weight of authority from other state and federal courts that have considered the "third party withdrawal" issue supports Olympic's claim that a sistership clause, like the one in Olympic's policy,[3] applies only when an insured withdraws its own product from the market.

In *Elco Indus., Inc. v. Liberty Mut. Ins. Co.*, 90 Ill. App. 3d 1106, 1108, 414 N.E.2d 41, 43 (1980), Elco sold Kohler defective regulating pins, which Kohler installed in its engines. Kohler recalled the engines, disassembled each engine to remove the pin, then reassembled the engines. 90 Ill. App. 3d at 1108. Elco paid damages to Kohler, then sought a declaration that its insurance policy covered the damages claims. Elco's insurer denied coverage because it contended that the sistership clause excluded protection. The court rejected the insurer's contention that the sistership exclusion applied:

> A majority position among courts construing the provision holds that [the sistership] exclusion . . . is operable only where the withdrawal of the product was by the insured rather than a third party. . . . Here, Elco did not recall or withdraw any product claimed to be defective; Kohler recalled the engines containing the defective pins.

(Citations omitted.) 90 Ill. App. 3d at 1110.

In *International Hormones, Inc. v. Safeco Ins. Co. of Am.*, 57 A.D.2d 857, 394 N.Y.S.2d 260 (1977), International manufactured hormone suspensions. Bel-Mar used the hormone suspensions to create materials for human injection and resold the material to medical facilities. 57 A.D.2d at

---

[3]The 1985 Comprehensive General Liability policy form amended the language of the sistership exclusion, specifically to avoid the confusion surrounding the applicability of the exclusion when a third party recalls a product. 2 R. Long, *Liability Insurance* § 11.09[3] (1990).

857. The FDA recalled Bel-Mar's product because it was not sterile. Bel-Mar sued International Hormones, which in turn asked that its insurer defend the suit. The insurer denied coverage, based on the sistership exclusion in International's policy. The court concluded that the sistership clause did not exclude coverage because:

> clauses identical to this one have been held . . . operative only where the withdrawal is by the insured party itself, and not, as here, where the product is recalled by a third party . . ..

57 A.D.2d at 857.

Finally, in *Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co.*, 34 N.Y.2d 356, 314 N.E.2d 37, 357 N.Y.S.2d 705 (1974), Gioia sold Lipton noodles, which Lipton put in its soups. When the parties discovered that the noodles were tainted, Lipton notified the trade and the general public, withdrew its affected soups from the market, and recalled its stocks of pasta. Lipton filed an action to recover damages from Gioia, including costs related to the recall of the tainted product. Liberty Mutual, Gioia's insurer, denied coverage based on the sistership exclusion in Gioia's policy.

The New York court disagreed, stating that:

> [T]he [sistership] exclusion in each policy extends only to claims . . . arising from withdrawal and recall by the named insured, *Gioia*. . . .
>     . . . Thus, in the present factual setting had Gioia withdrawn its own macaroni and noodles, Liberty Mutual would not have been obligated to indemnify Gioia for any third-party claims made by Lipton against Gioia for damages sustained by Lipton in consequence of such withdrawal by Gioia . . ..

34 N.Y.2d at 360-61.

Several other state courts have embraced the rule that a sistership exclusion applies only when the insured withdraws its own product from the market, but have found the exclusion inapplicable to the cases before them for other reasons. *See United States Fid. & Guar. Co. v. Wilkin Insulation Co.*, ____ Ill. App. 3d ____, 550 N.E.2d 1032, 1040 (1989); *Marathon Plastics, Inc. v. International Ins. Co.*, 161 Ill. App. 3d 452, 465, 514 N.E.2d 479, 487 (1987), *review*

*denied,* 119 Ill. 2d 559 (1988); *Parker Prods., Inc. v. Gulf Ins. Co.,* 486 S.W.2d 610, 613 (Tex. Civ. App. 1972), *aff'd,* 498 S.W.2d 676 (Tex. 1973).

The Court of Appeals distinguished *Elco* from this case because Elco sought coverage for consequential damages that its product caused to the goods of another, while Olympic seeks damages for defects in its own product. This distinction is flawed because it presumes that the packers' canned salmon is Olympic's product, a presumption which the facts and the law, discussed below, do not support.

The court distinguished *Lipton* from this case because it did not believe that the cost Lipton incurred in recalling the pasta stock was a significant part of the damages that Lipton claimed. The *Lipton* court, however, stated only that Lipton "incurred substantial expense" when it withdrew its soups and stocks from the market: nothing in the *Lipton* opinion supports the Court of Appeals speculation that the cost to Lipton of withdrawing the tainted stock was insignificant. Further, there is no authority which suggests that the scope of coverage, or the application of the sistership clause, depends on "some minimum degree" of damage. 90 Ill. App. 3d at 1110-12. The court also suggested that *Lipton* does not apply because in *Lipton* the third party took all the steps necessary to recall the product, while in this case Olympic, the insured, oversaw the recall. The record establishes, however, that after Olympic notified the Association and the packers of the defect, then the FDA, not Olympic, oversaw the product recall. The weight of state authority, including *Lipton* and *Elco,* supports the conclusion that a sistership clause does not apply when a third party removes the insured's product from the market.

The federal courts have not settled the "third party withdrawal" issue. In *Todd Shipyards Corp. v. Turbine Serv., Inc.,* 674 F.2d 401 (5th Cir.), *cert. denied,* 459 U.S. 1036 (1982), the case upon which Olympic relies, the insureds improperly installed blades in a turbine engine, and the

defective blading destroyed the engine. The ship's owners and Todd Shipyards filed claims against the insureds, who in turn sought coverage from their insurers. The insurers argued that the sistership exclusion in the insureds' policies precluded coverage for the claims. The court concluded that the exclusion did not apply because the damages claimed arose "from the malfunctioning of a product where no 'sister' products are involved". 674 F.2d at 419. In a footnote, the court stated, "As an independent ground for this conclusion", that most courts did not apply the sistership clause when the product was withdrawn by a third party.[4] 674 F.2d at 419 n.13. The observation is dicta, however, since the court did not dispose of the claim on this "independent ground".

Several other federal courts also have adopted the rule that the exclusion applies only when the insured removes its product from the market, but found the exclusion inapplicable to the case before them for other reasons. *Aetna Cas. & Sur. Co. v. PPG Indus., Inc.*, 554 F. Supp. 290, 295 (D. Ariz. 1983); *Bigelow-Liptak Corp. v. Continental Ins. Co.*, 417 F. Supp. 1276, 1281-82 (E.D. Mich. 1976) (citing *Arcos Corp. v. American Mut. Liab. Ins. Co.*, 350 F. Supp. 380 (E.D. Pa. 1972), *aff'd in part and dismissed and remanded in part mem.*, 485 F.2d 678 (3d Cir. 1973). We do not rest our decision on this federal authority, but these federal decisions provide additional support for our conclusion that a sistership clause does not exclude coverage if a third party withdraws the insured's product from the market.

█ In conclusion, a review of state authority reveals that a majority of the jurisdictions, which address the issue,

---

[4] The *Todd* court misstated the rule: "most courts hold [the sistership] exclusion . . . inapplicable where the product is withdrawn by the insured rather than a third party." 674 F.2d at 419 n.13. The context in which the court offers its observation, and its citation to *Elco Indus., Inc. v. Liberty Mut. Ins. Co.*, 90 Ill. App. 3d 1106, 1110, 414 N.E.2d 41 (1980) make clear both the court's misstatement and its intent.

conclude that a sistership clause does not exclude coverage if a third party withdraws the insured's product from the market. We believe that this rule is sound, and it fairly balances the interests of the parties. The rule does not impose on the insurer the cost of an insured's curative or preventative measures, but provides the insured with protection against a foreseeable element of claims that commonly arise in economic and factual settings similar to Olympic's. We therefore hold that a sistership clause, phrased as is the clause in Olympic's policy, does not preclude coverage when a third party withdraws the insured's product from the market.

## WHAT IS AN "INSURED'S PRODUCT"

Olympic urges that the sistership exclusion does not apply because the canned salmon was not its "product" or "work completed by" it, as required by the exclusion. The sistership clause, Olympic contends, precludes coverage only where the insured deals or trades in the goods, but not where it merely provides a service on the product of another. We agree, because the court too broadly interpreted the term "insured's products".

Olympic's insurance policy defines an "insured's product" as "goods or products manufactured, sold, handled or distributed by the **named insured**". Clerk's Papers, at 33. Two Washington cases address the meaning of the term "insured's product". The courts in *Westman Indus. Co. v. Hartford Ins. Group*, 51 Wn. App. 72, 78, 751 P.2d 1242, *review denied*, 110 Wn.2d 1036 (1988) and in *Prosser Comm'n Co. v. Guaranty Nat'l Ins. Co.*, 41 Wn. App. 425, 431, 700 P.2d 1188, *review denied*, 104 Wn.2d 1016 (1985) stated that:

> The terms goods or products manufactured, sold, handled or distributed in the clause defining the insured's products, when read together, imply goods which are processed or assembled in the ordinary channels of commerce.

The factual differences between *Westman* and this case undermine its persuasiveness. The insured in *Westman* both manufactured parts for and completely assembled a boathouse. 51 Wn. App. at 79, 81. The court concluded the boathouse was Westman's product because Westman's business involved both the manufacture and "*also* involve[d] the provision of services" for the boathouse. (Italics ours.) 51 Wn. App. at 81. Olympic, in contrast, did not manufacture anything: it affixed the packers' labels to the packers' cans and placed them in the packers' boxes. *Westman* is not authority in this case. *Prosser* also is not persuasive. First, the *Prosser* definition is tautological. Secondly, the cases upon which *Prosser* rests uniformly reject a broad definition of "insured's product" and define an insured's product as tangible items created or manufactured by the insured. *See Prosser Comm'n Co. v. Guaranty Nat'l Ins. Co.*, *supra* at 431. *Prosser*, thus, is not controlling in this case.

■ The preferable definition of "insured's product" is the definition formulated in *Paxton-Mitchell Co. v. Royal Indem. Co.*, 279 Or. 607, 615-16, 569 P.2d 581, 586 (1977). The *Paxton-Mitchell* court considered whether a "products" or "work" exclusion barred coverage of claims against an insured, who installed a crane on a customer's truck when the crane tipped over, and the customer recovered for damage to the truck. The court inquired:

> "What are 'goods or products'? These two words standing alone have a meaning which is most commonly associated with the commercial world. They are most often thought of as some tangible or material units in which one trades. The qualifying words 'manufactured, sold, handled or distributed' really do not broaden the ordinary meaning associated with these words, but limit 'goods or products' to those in which the insured trades or deals. * * *" Henderson, *Insurance Protection for Products Liability and Completed Operations — What Every Lawyer Should Know*, 50 Neb L Rev 415, 429-30 (1971).

279 Or. at 615-16. The *Paxton* court concluded that an "insured's product" is "that in which the insured trades or

deals", and that the truck was not the insured's product because the insured did not deal or trade in trucks. 279 Or. at 616; *cf. Friestad v. Travelers Indem. Co.*, 260 Pa. Super. 178, 393 A.2d 1212 (1978) (the terms "goods" and "products" imply the creation of tangible items); *Kammeyer v. Concordia Tel. Co.*, 446 S.W.2d 486, 489 (Mo. Ct. App. 1969) ("goods or products" of the named insured refers to "goods or products created or manufactured and placed in the ordinary channels of commerce" by the insured).

We hold that an "insured's product" refers to goods or products in which the insured trades or deals, including goods created or manufactured by the insured. Olympic did not trade or deal in, manufacture or create the packers' canned salmon. The salmon was not Olympic's product, for purposes of the sistership exclusion in Olympic's policy.

### WHAT IS "HANDLED" FOR PURPOSES OF THE SISTERSHIP EXCLUSION

■ ■ Centennial argues, alternatively, that an insured's product includes goods of others that the insured "handled" and that because Olympic "handled" the canned salmon, the salmon is its product. The courts that have considered this argument expressly rejected it. The courts in *Gulf Mississippi Marine Corp. v. George Engine Co.*, 697 F.2d 668, 672 (5th Cir. 1983) and in *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 419-20 (5th Cir.), *cert. denied*, 459 U.S. 1036 (1982) interpreted the term "handled" as used in a definition of "insured products" that is identical to the definition contained in Olympic's policy. The courts reasoned that:

> It is true that the verb "handle" means to "touch; to feel with the hand; to hold, take up, move, or otherwise affect, with the hand." * * * Webster also defines "handle" as "to buy and sell; to deal, or trade in." That the intention of the insurer was to restrict the word "handled" to this meaning is apparent from the words "manufactured, sold * * * or distributed," with which it is linked.

674 F.2d at 419-20. Both courts found that the verb "handled" meant "to deal or trade in", rather than "to touch". 674 F.2d at 420; *see also Paxton-Mitchell Co. v. Royal Indem. Co.*, 279 Or. 607, 616-17, 569 P.2d 581, 587 (1977) (narrow definition of "handled" as "to deal or trade in" is more logical and between two business parties that definition of the word would be intended); *Smedley Co. v. Employers Mut. Liab. Ins. Co.*, 143 Conn. 510, 123 A.2d 755, 758 (1956) (insured who stored customer's product and, at customer's direction, placed the product on its shipping platform for shipper to pick up, did not "handle" the product). The broad definition of the verb "handled" that Centennial advocates renders coverage under a comprehensive general liability policy illusory:

> it is difficult to conceive of a service which does not involve the handling of some object, so that, arguably, even the "purest" of service-type operations from which liability might arise could be categorized as excluded . . ..

260 Pa. Super. at 187-88.

We reject the all-inclusive definition of the term "handle" that Centennial advocates and approve a narrower definition of the word as to buy, sell, distribute, or trade in. The labeling, casing, and shipping process that Olympic undertook at the direction of the salmon packers, using materials that the salmon packers provided, did not constitute "handling", for purposes of the sistership exclusion, or make the packers' canned salmon Olympic's "product" or its "work".

### ATTORNEY FEES

Olympic requested and the trial court awarded it attorney fees pursuant to Supplementary Payments ¶ D of its insurance policy. Supplementary Payments ¶ D provides that:

> The Company [Centennial] will pay, in addition to the applicable limits of liability:
>     . . . .

> . . . reasonable expenses incurred by the *insured* at the Company's request in assisting the Company in investigation or defense of any claim or suit . . . ..

Clerk's Papers, at 36.

■ Olympic argued that it is entitled to attorney fees at trial because Centennial denied coverage of the salmon packers' claims and thereby necessitated this lawsuit. A "claim" is a demand for compensation. *Safeco Title Ins. Co. v. Gannon*, 54 Wn. App. 330, 335, 774 P.2d 30, *review denied*, 113 Wn.2d 1026 (1989). Because the policy distinguishes between "claims" and "suits", the terms cannot mean the same thing. 54 Wn. App. at 334. Thus, the fact that salmon packers did not file a lawsuit against Olympic to recover their inspection costs does not preclude an award of attorney fees, as Centennial suggests. The claims of the salmon packers for reimbursement provide a sufficient basis for an award of attorney fees under the language of Supplementary Payments ¶ D, in Olympic's policy. Further, the fact that Centennial did not initiate investigation of the claim is not dispositive. *See Smith v. Ohio Cas. Ins. Co.*, 37 Wn. App. 71, 75, 678 P.2d 829 (1984). We therefore hold that Olympic was entitled to an award of fees at trial pursuant to Supplementary Payments ¶ D of its policy.

■ We also extend the right of an insured to recoup attorney fees that it incurs because an insurer refuses to defend or pay the justified action or claim of the insured, regardless of whether a lawsuit is filed against the insured. Other courts have recognized that disparity of bargaining power between an insurance company and its policyholder makes the insurance contract substantially different from other commercial contracts. *Hayseeds, Inc. v. State Farm Fire & Cas.*, 352 S.E.2d 73, 77 (W. Va. 1986). When an insured purchases a contract of insurance, it seeks protection from expenses arising from litigation, not "vexatious, time-consuming, expensive litigation with his insurer." 352 S.E.2d at 79. Whether the insured must defend a suit filed by third parties, appear in a declaratory action, or as

in this case, file a suit for damages to obtain the benefit of its insurance contract is irrelevant. In every case, the conduct of the insurer imposes upon the insured the cost of compelling the insurer to honor its commitment and, thus, is equally burdensome to the insured. *Hayseeds, Inc. v. State Farm Fire & Cas.*, 352 S.E.2d 73, 77 (W. Va. 1986); *cf. Security Mut. Cas. Co. v. Luthi*, 303 Minn. 161, 226 N.W.2d 878, 884 (1975).[5] Further, allowing an award of attorney fees will encourage the prompt payment of claims. 352 S.E.2d at 79.

In *Farmers Ins. Co. v. Rees*, 96 Wn.2d 679, 638 P.2d 580 (1982), we acknowledged that an action for declaratory judgment that concerned only the issue of coverage, not the duty to defend, imposed a financial burden on the insured. We concluded, however, that the burden was too "strained and remote" from the insured's duty to pay attorney fees incurred because of "hearings or trials", as set forth in the insurance contract. 96 Wn.2d at 682, 684. Upon reconsideration, however, we believe that an award of fees is required in any legal action where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract, regardless of whether the insurer's duty to defend is at issue. We thus overrule *Farmers* to the extent that it is inconsistent with our holding today.

Olympic also requests an award of fees on appeal, pursuant to RAP 18.1. RAP 18.1(a) authorizes an award of fees if "applicable law grants to a party the right to recover reasonable attorney fees". Olympic is entitled to attorney fees on appeal, pursuant to RAP 18.1, for the reasons discussed above.

CONCLUSION

1. A sistership clause worded as is the clause in Olympic's insurance policy does not exclude coverage when a third

---

[5]These principles, in conjunction with the language in Supplementary Payments ¶ D, support the award of the so-called "Salwasser" fees.

party, not the insured, withdraws the insured's product from the market.

2. The term "insured's product" refers to goods or products in which the insured trades or deals. The packers' canned salmon was not Olympic's product for purposes of the sistership clause.

3. Olympic is entitled to an award of attorney fees, pursuant to RAP 18.1 and the language of Supplementary Payments ¶ D of its insurance policy.

4. An insured who is compelled to assume the burden of legal action to obtain the benefit of its insurance contract is entitled to attorney fees, regardless of whether the duty to defend is at issue.

We affirm the trial court and award reasonable attorney fees on appeal. The amount of the reasonable attorney fees shall be determined by the Supreme Court Commissioner pursuant to RAP 18.1.

UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, and GUY, JJ., and CALLOW, J. Pro Tem., concur.

ANDERSEN, J., concurs in the result.

Reconsideration denied September 4, 1991.