[No. 49584-4-I. Division One. January 13, 2003.]

UNIVERSAL HOLDINGS II LIMITED PARTNERSHIP, ET AL.,
*Appellants*, v. OVERLAKE CHRISTIAN CHURCH, ET AL.,
*Respondents*.

60

*Alan B. Bornstein* (of *Jameson Babbitt Stites & Lombard, P.L.L.C.*), for appellants.

*Jerret E. Sale* and *Deborah L. Carstens* (of *Bullivant Houser Bailey, P.C.*), for respondents.

KENNEDY, J. — Transnation Title Insurance Company insured Universal Holdings II Limited Partnership's title to 74 acres of land located in Redmond, Washington. Transnation provided the property description contained in its commitments for title insurance, the statutory warranty deed by which title to the property was conveyed to Universal by its grantor, Overlake Christian Church, and the 1970 Form B American Land Title Association (ALTA) title insurance policy itself. Unfortunately, that description contained an error, the result of which was that Universal bargained, paid for, and insured its title to 3,000 square feet of land that actually belonged to a neighboring landowner. After trying without success to negotiate a lot line adjustment with the neighboring landowner so as to resolve the problem, Universal eventually brought this lawsuit against Transnation, seeking recovery under the title insurance policy for its loss of the 3,000 square feet of land, and against Overlake Christian Church also seeking recovery under the statutory warranty deed. The trial court ultimately dismissed both causes of action on summary judgment, and denied Universal's motion that it was entitled to summary judgment against Transnation on the issue of liability.

In the published portion of this opinion, we reverse the summary judgment dismissing Universal's claim against Transnation and remand for entry of summary judgment in favor of Universal on the issue of Transnation's liability under the policy of title insurance. Transnation does not deny that its policy provides coverage for Universal's loss of the 3,000 square feet of land. Nor does Transnation contend that it is entitled to terminate the policy based on the nearly six-year-long delay between Universal's discovery of the error and the bringing of the lawsuit. It contends, instead, that the lawsuit is premature because (1) Universal has never furnished it with a notice of loss as required by the terms of the policy, (2) without a formal notice of loss there is no claim that can be properly adjusted—either by paying Universal the amount of its loss or by purchasing

the missing 3,000 square feet from the neighboring landowner so as to convey the property to the insured—and (3) Universal is trying to "dodge" its obligation to furnish the notice of loss in order to improperly utilize a jury, in place of the claims adjustment process, to quantify the amount of its loss. We reject these contentions. Transnation did not deliver the ALTA policy to Universal until it was produced in the course of discovery, after this lawsuit was filed. On that ground alone, Transnation cannot properly claim that the lawsuit is premature because Universal failed to comply with a provision in the policy requiring it to furnish a *written* notice of loss, when Universal had never even seen its policy before it was produced during discovery. Moreover, an insurer that claims its insured has breached a material term of the policy must show prejudice arising from the breach. Transnation has shown no prejudice to its ability to defend against summary judgment as to liability arising from Universal's failure to furnish a written notice of loss (Universal did not move for summary judgment as to damages). There can be no doubt that Universal has suffered a covered loss of 3,000 square feet of land. If the parties cannot sooner agree upon the dollar value of the loss (or if Transnation cannot sooner purchase the missing 3,000 square feet so as to convey it to Universal) a jury will have to quantify the amount of Universal's loss. There is nothing improper about that.

We also award Universal its reasonable attorney fees for this appeal, based on *Olympic Steamship Co. v. Centennial Insurance Co.*, 117 Wn.2d 37, 52-53, 811 P.2d 673 (1991) (an award of fees is required in any legal action where the insurer compels the insured to assume the burden of legal action in order to obtain the benefit of its policy).

We affirm the trial court's grant of summary judgment to Overlake Christian Church in the unpublished portion of this opinion.

## FACTS

In 1985, R.S. & Associates-Redmond (R.S.) purchased 74 acres of former dairy farm land in Redmond, Washington. On one edge of the property is a section of land, measuring 100 feet by 465 feet, that is owned by the Simpson family. The deed to the property erroneously described the Simpsons' property as 435 feet in length. R.S. learned of the error in 1988 during a plat application to divide its acreage into 27 lots. R.S. made a loss claim to its title insurer and settled the matter.

On December 20, 1991, R.S. conveyed the property to Overlake Christian Church, by statutory warranty deed, for $1.865 million. The deed correctly described the 74 acres. Overlake Christian Church paid $1 million at closing, and issued an $865,000 promissory note for the remaining balance. The promissory note gave Overlake an option to tender the property back to the holder, by written notice, by a set date. If that option were exercised, the deal required R.S. to repay the $1 million paid at closing.

By letter dated August 5, 1993, Overlake Christian Church exercised its right to tender the land back to R.S. because it was unable to obtain governmental approval for the design and construction of its church development. R.S. began looking for another prospective purchaser for the acreage.

In July 1994, after finding Universal as a prospective purchaser, R.S. ordered a commitment for title insurance from Transnation. In preparing the commitment, Transnation's title examiners relied upon a commitment that had been issued in January 1992 for an unrelated transaction involving the same property. That commitment contained the same error in the legal description of the property as had occurred when R.S. initially purchased the property. The title examiners did not examine title records for transactions earlier than the date of that commitment; thus, the examiners did not look at the deed by which R.S. conveyed the property to Overlake Christian Church in

December 1991—which deed contained the correct legal description.

On July 15, 1994, Universal and R.S. executed a real estate purchase and sale agreement (REPSA), wherein Universal agreed to buy the 74 acres for $1.275 million. The REPSA contained Transnation's incorrect property description. The REPSA also stated that:

> [Universal] agrees to accept the statutory warranty deed . . . directly from [Overlake Christian Church] as grantor, provided that such instruments otherwise meet the requirements of this Agreement and such acceptance does not affect the representations, warranties and covenants made herein by Seller.

Clerk's Papers at 32. Overlake Christian Church wanted to simply unwind the 1991 transaction by executing a rescission deed to the property, so that R.S. could then convey the property to Universal, but R.S. insisted that Overlake convey the property directly to Universal via a statutory warranty deed in order to save excess closing costs. Overlake Christian Church ultimately agreed to this.

Universal then sought an extended policy of title insurance, which required that a surveyor do an ALTA survey of the land. On July 28, 1994, third-party defendant Triad Engineering conducted a survey and prepared a survey map. Triad did not discover the error in the legal description, and used the incorrect description contained in the commitment for its survey.

Transnation issued its second commitment for title insurance on August 2, 1994. This second commitment identified the title policy as an extended policy and bore the same incorrect legal description as was in the first commitment. Universal received and reviewed the commitments, and relied upon the legal description contained in the commitments in preparing the statutory warranty deed for the purchase of the property.

On August 11, 1994, Overlake Christian Church executed the statutory warranty deed containing the incorrect legal

description. The transaction closed the following day, August 12, 1994. The ALTA policy of title insurance took effect at closing.

The 1970 Form B ALTA policy states:

### 4. NOTICE OF LOSS—LIMITATION OF ACTION

In addition to the notices required under paragraph 3(b) [dealing with a written notice of claim requirement] of these Conditions and Stipulations, a statement *in writing* of any loss or damage for which it is claimed the Company is liable under this policy shall be furnished to the Company within 90 days after such loss or damage shall have been determined and no right of action shall accrue to an insured claimant until 30 days after such statement shall have been furnished. Failure to furnish such statement of loss or damage shall terminate any liability of the Company under this policy as to such loss or damage.

Clerk's Papers at 1081 (emphasis added). Transnation did not deliver the policy to Universal until May 2001, after this lawsuit was commenced. A representative of Transnation testified at deposition that the policy was not delivered sooner because Transnation discovered the error in the legal description and hoped that the defect might somehow be resolved in the future.

Within a month or two after Universal acquired the property, it began fencing it in. Neighboring landowners, the Simpsons, called and met with Mr. Del Moro of Universal, and told him that some of the fencing intruded 30 feet onto their property. Mr. Del Moro researched the Simpsons' title and discovered that, indeed, they owned 3,000 square feet of the property that Universal had bargained and paid for.

The notice from the Simpsons created an unexpected problem in Universal's development plan for the acreage. The Simpsons owned the strip of property some 30 feet wide and 100 feet long through which Universal planned to run a north-south access road. To run the road to the west, instead, would require building over a ravine, and would result in substantially higher construction costs. Universal

commenced discussions with the Simpsons, in an effort to negotiate a lot line adjustment. No agreement was reached, however.

By November 1995, Universal had notified Transnation of the situation, and Transnation had opened a claim file to which it assigned the number 95-8-4266. Transnation investigated the loss and prepared a claim report on December 4, 1995, which stated: "Title commitment was prepared and did not disclose or deal with apparent 30 foot overlap onto adjoining property. The adjoining property was excepted from our legal description with an erroneous depth (435 feet)." Clerk's Papers at 620. Transnation's title officer, Mr. Campbell, sent a memorandum to Transnation's assigned associate counsel, Mr. Bickel, detailing the title defect. In December 1995, Transnation assigned a potential loss to the claim in the amount of $30,000. Transnation offered Universal $3,000 to settle the claim. Universal rejected the offer.

Universal's Mr. Del Moro and Transnation's Mr. Bickel met in February 1996, to discuss the claim. Mr. Del Moro thought that Universal might yet be able to negotiate a lot line adjustment with the Simpsons, and he wanted to deal with the Simpsons tactfully in order to avoid future objections from them with respect to Universal's plan for development of the property. Mr. Bickel subsequently sent two letters, dated April 22, 1996, and May 7, 1996, stating that Universal's tender of "the matter of the loss of 30 feet will initiate the claim resolution process" and asking "whether Universal Holdings intends to tender the resolution of the legal description error to Transnation Title Insurance Company pursuant to the owner's title insurance policy." Clerk's Papers at 335, 338.

Universal's Mr. Del Moro responded by telephone to Mr. Bickel's April and May letters. He subsequently testified that he asked Mr. Bickel to resolve the title problem. Mr. Del Moro did not make a written response. He subsequently testified that after the telephone call, he did not think he needed to respond in writing. He also testified:

[It's h]ard to tender a claim when you don't know what the value or extent of that claim is and it depends on the fact that you've got to develop a plan that shows whether you can deal or not deal with that missing 30 feet. Plus, you're trying to wait for a response from the Simpsons as to whether they'll sell or not sell or whether they'll exchange some property.

Clerk's Papers at 304. Mr. Del Moro testified that he believed that the damages in a "best case" scenario would be $298,000 to $448,000.

Over the next two years, Universal communicated sporadically by letters and telephone calls to Transnation's counsels, Mr. Bickel and Mr. Higgins.

On July 14, 1997, a "Major Claim Report" was created by Mr. Reetz of Transnation. In part, the report states:

04/96–[Universal] sought and was granted right to negotiate w/owner (Simpson) because of prior contact and concerns over development permits. Commitment was made to pay certain land use associated costs but nothing offered by TTIC re acquisition costs. No formal claim has been made by insured; last communication to insured was 05/07/96.

07/03/97–no change.

Clerk's Papers at 622.

On December 16, 1997, Transnation's Mr. Higgins prepared a "Claim Adjustment Form" that closed the claim. Believing that the claim was still pending, Mr. Del Moro, on January 11, 1999, sent a demand letter and exhibits to Mr. Bickel that identified the claim number and the title defect, referred to the years of discussion, and threatened legal action if Transnation did not address the claim.

Transnation's Mr. Higgins responded on February 17, 1999, with a letter to Mr. Del Moro identifying the claim number and stating that the claim had been reassigned to him "for investigation and reply" and asking that he be permitted "an opportunity to get acquainted with the title documentation and issues by reviewing same before I reply." Clerk's Papers at 639. Mr. Higgins never provided

the promised reply to Mr. Del Moro's demand, however. Nor did Mr. Higgins notify Mr. Del Moro that he had already closed the claim file.

In July 2000, Universal filed a complaint for breach of contract against Transnation and Overlake Christian Church. R.S., Triad Engineering, and others were brought into the suit as third-party defendants; they are not parties to this appeal.

On June 29, 2001, the trial court granted Transnation's motion for summary "dismissal of any contract claim (other than a claim under the title policy contract)" by Universal. Clerk's Papers at 828.

In September 2001, Universal, Transnation, and Overlake Christian Church filed cross-motions for summary judgment; Universal and Transnation moved for summary judgment on the issue of liability under the insurance title policy. Universal and Overlake Christian Church moved for summary judgment on the issue of Overlake's liability under its statutory warranty deed. Overlake also brought an alternative motion for summary judgment against third-party defendant R.S.

On October 26, 2001, the trial court granted both Transnation's and Overlake Christian Church's motions for summary judgment and denied Universal's cross motions. On November 15, 2001, Universal appealed the trial court's summary judgment orders.

## ANALYSIS

### Transnation's Motions for Summary Judgment[1]

We deal first with Transnation's contention that by granting its motion for summary "dismissal of any contract claim (other than a claim under the title policy contract)" by order dated June 29, 2001, the trial court dismissed the "legal description error" claim against Transnation, and that since Universal has not appealed that order, it is final. The

---

[1] We review the trial court's summary judgment order de novo. *Kruse v. Hemp*, 121 Wn.2d 715, 722, 853 P.2d 1373 (1993) (the appellate court reviews a summary judgment order de novo, performing the same inquiry as the trial court).

trial court's order of June 29 does not contain the language "legal description error." Instead, the trial court referred to dismissal of claims "other than the title policy contract" and stated that "[i]nterpretation of the title policy contract is not before the court [on June 29]." Clerk's Papers at 829. Universal had brought an extra-contractual claim against Transnation that sounded in tort. That claim was indeed dismissed on June 29, 2001, and Universal has not appealed the order dismissing it. Thus, the only issue before us as between Transnation and Universal is whether the trial court erred by entering its order of October 29, 2001, denying Universal's motion for summary judgment on the issue of liability under the title insurance policy, granting Transnation's motion for summary judgment on that issue, and dismissing Universal's complaint against Transnation.

Transnation concedes that Universal notified it of a "potential problem" in late 1995, thus satisfying the requirement under paragraph 3(b) of the 1970 Form B ALTA policy to provide written notice of a *claim*. Transnation argues, however, that Universal failed to provide it with a written statement of *loss*, as required under paragraph 4 of the policy, and thus only a "potential" claim exists, and Universal's suit for breach of the title insurance policy is premature. Transnation asserts that it is not seeking to deny coverage under the policy—thus it is not claiming that Universal's suit is forever barred, either because Universal waited nearly six years after discovering the loss before filing the lawsuit, or because Universal has never furnished a formal, written statement of loss. Despite the fact that the trial court's October 29 order, which was drafted by counsel for Transnation, does not state that the dismissal is without prejudice, Transnation asserts that a dismissal without prejudice is all that it ever sought. Transnation argues that by refusing to furnish a statement of loss, Universal is improperly attempting to substitute a jury trial for the claims adjustment process that is contemplated under the policy. Transnation asserts that until Universal furnishes it with a statement of loss, it is not obligated to adjust the

claim at all, either by settling with Universal directly and paying it the amount of its loss, or by purchasing the missing 3,000 square feet of land from the Simpsons so as to convey it to Universal and settle the claim by that means. The trial court agreed with Transnation, granted summary judgment of dismissal to Transnation, and denied Universal's motion for summary judgment on the question of liability under the policy because Universal "failed to comply with their contractual duties to submit a proof of loss."[2] Clerk's Papers at 1207.

■ We reject Transnation's contentions. First, Transnation failed to deliver the policy to Universal until after this lawsuit was filed. The testimony of one of Transnation's representatives establishes that this was a deliberate omission, not an oversight. The representative testified that Transnation had discovered the error in the legal description but didn't deliver the policy in the hope that the matter might resolve itself. Transnation cannot be heard to argue that this lawsuit is premature based on language in a policy of title insurance that its insured never even saw until after it filed the lawsuit. Although it is true that Transnation wrote to Universal asking it to furnish a written statement of loss, and Universal responded by telephone instead of in writing, such a letter is simply not an adequate substitute for the policy itself.

It is true that Universal has not yet put a "hard number" on its loss, even after receiving the policy and reading the notice of loss provision contained therein. In its complaint, Universal alleged that its loss was "at least $150,000." During depositions, Mr. Del Moro testified that he thought the amount of the loss was between $298,000 and $448,000. It is also true that Universal at first wanted to deal with the Simpsons itself, while it thought there might be a possibility of obtaining a lot line adjustment, and that it hoped to avoid future objections from the Simpsons to its planned development of the acreage, and accordingly wanted to deal

---

[2] The trial court appears to have misspoken. The policy requires "notice of loss," not "proof of loss." Clerk's Papers at 108.

with them tactfully. But by January 11, 1999, at the latest, Universal made it clear that it wanted Transnation to resolve the matter, for it was on that date that Mr. Del Moro sent Universal's demand letter and exhibits to Transnation. Transnation's Mr. Higgins replied to that letter by asking for time to get acquainted with the issues before responding. Mr. Higgins did not disclose that he was already well acquainted with the issues and that he had already closed the claim file; in fact, he never responded at all to the demand part of the letter. And so, in July of 2000, Universal filed this lawsuit. The lawsuit is not premature.

■ There is no doubt whatsoever that Universal has suffered a loss that is covered by the policy of title insurance. It lost 3,000 square feet of land that is vital to its planned development of the property, land that it bargained and paid for, and title to which it insured by paying Transnation's policy premium. *Cf.*, *Summonte v. First Am. Title Ins. Co.*, 180 N.J. Super. 605, 436 A.2d 110, 116 (Ch. Div.), *aff'd*, 184 N.J. Super. 96, 445 A.2d 409 (1981) (presence of undetected lien reduced the value of the insured's property and that was an actual loss; insured did not first have to first pay the lien or suffer foreclosure in order to sustain a loss under the policy).

Although Universal has had difficulty placing a specific dollar value on its loss, due in part to uncertainties about whether a deal with the Simpsons might still be possible, as well as to the inherent uncertainties that accompany the planning and development of property where the permitting process is subject to public hearings and conditions imposed by governmental permitting authorities, at some point, Universal will simply have to place a dollar value on its loss. Transnation will be entitled to discover, long before this case reaches a jury, what Universal thinks it can prove in terms of the value of its loss. But neither side sought summary judgment as to the amount of Universal's loss. Rather, both sides sought summary judgment only as to Transnation's liability under the policy. By the time of summary judgment, the parties were not ready to litigate

damages—that issue was, indeed, premature. But the issue of liability was not.

 Transnation has not shown how it was prejudiced in the summary judgment process that took place in October 2001 by Universal's failure to submit a formal, written, notice of loss, quantifying the value it placed on its claim. Insurers are not released from their insurance obligations to an insured because of an alleged noncompliance with policy terms by the insured, unless the insurer can show actual prejudice. *See, e.g., Or. Auto. Ins. Co. v. Salzberg*, 85 Wn.2d 372, 376-77, 535 P.2d 816 (1975). We conclude that this principle applies to title insurance as well as to any other kind of insurance, and Transnation does not seriously argue otherwise. At some point in the future of the litigation, Transnation might suffer such prejudice, if Universal does not soon get down to the business of quantifying its loss so that Transnation can conduct discovery for purposes of either settling the claim short of a jury trial or preparing to try the issue. Transnation has the right of discovery with respect to the amount and elements of the loss that Universal will seek to prove, well in advance of a trial. In that sense, Transnation has a valid point: Universal cannot properly utilize a jury as the sole means of claims adjustment. But discovery of the value of the loss was not necessary to a determination of the issue of Transnation's liability under the policy. There was no prejudice at that juncture of the litigation arising from Universal's failure to quantify its loss.

We reverse the trial court's grant of summary judgment to Transnation and remand for entry of summary judgment in favor of Universal on the issue of Transnation's liability under the policy of title insurance.

Attorney Fees and Costs

Universal requests attorney fees and costs from Transnation because it was forced to bring this lawsuit and appeal in order to obtain the benefits of its insurance policy. Transnation has failed to respond to this issue in its briefs.

■ We award fees and costs on appeal, as mandated by *Olympic Steamship Co. v. Centennial Insurance Co.*, 117 Wn.2d 37, 52-53, 811 P.2d 673 (1991) (an award of fees is required in any legal action where the insurer compels the insured to assume the burden of legal action in order to obtain the benefits of the insurance policy). Universal may request the trial court to award fees for the summary judgment proceeds below, following our remand.

Reversed and remanded for further proceedings consistent with this opinion.

A majority of the panel having determined that the remainder of this opinion lacks precedential value and will not be printed in the Washington Appellate Reports but will be filed for public record in accord with RCW 2.06.040, it is so ordered.

AGID and APPELWICK, JJ., concur.

Reconsideration denied February 21, 2003.

Reconsideration granted and unpublished portion of opinion modified September 25, 2003.