# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| ANDREA MOORE, | No.  60406-0-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| STATE OF WASHINGTON DEPARTMENT OF CORRECTIONS, | |
| Respondent. | |

PRICE, J. — In March 2021, Ronald J. Clayton broke into an elderly woman's home and threatened to rape her.  Sheriff's Deputy Andrea Moore, after receiving a call for a welfare check, responded to the home.  Hiding behind the door, Clayton ambushed Deputy Moore and stabbed her in the neck.  Deputy Moore managed to shoot and disable Clayton before losing consciousness from her injuries.

This was not Clayton's first violent offense.  At the time of the incident, Clayton was on Department of Corrections supervision.

Clayton initially came under Department of Corrections supervision following a 1995 conviction for first degree rape and first degree assault.  After being released from prison, between 2011 and 2021, Clayton was in a revolving door of Department of Corrections custody.  He was sanctioned repeatedly for absconding and violating the terms of his community custody, and he incurred new charges for failing to register as a sex offender and for drug possession on multiple

occasions. At the time of Clayton's assault of Deputy Moore, Clayton had recently absconded from his supervision.

Deputy Moore later sued the State of Washington, the Department of Corrections, and additional unnamed individuals (collectively DOC), alleging that DOC had been grossly negligent in its supervision of Clayton given his history of violence and absconding from community custody.

DOC moved for summary judgment, arguing that Moore's claims were procedurally barred for two reasons. First, DOC argued that Moore's claims were barred by operation of the "professional rescue doctrine," which applies when a first responder is injured in the line of duty. Second, DOC argued that it has immunity for its decisions related to supervision of parolees. DOC further argued that even if Moore's claims were reviewed on the merits, she could not prove negligence, much less gross negligence

The superior court agreed and dismissed Moore's complaint with prejudice. We affirm.

FACTS

I. BACKGROUND

A. CLAYTON'S HISTORY OF CONFINEMENT AND COMMUNITY SUPERVISION 1995-2020

In 1995, Clayton was convicted of first degree rape and first degree assault after he broke into a woman's home, raped her, and strangled her with a power cord. He was released from prison in 2011 and began his term of community custody.

Clayton's behavior while on community custody was poor. Between 2013 and 2019, Clayton served multiple short sanctions for violations like failing to register as a sex offender, using methamphetamines, failing to report, and absconding from supervision.

In October 2019, Clayton was released from serving a sanction and placed on GPS monitoring. According to DOC records, Clayton made a series of concerning comments at the time of his release about his 1995 convictions. Although Clayton had already gone through sex offender treatment while incarcerated, DOC internally noted that Clayton should undergo additional sexual offender treatment "due to his thoughts of sexual deviancy." Clerk's Papers (CP) at 85.

Two days after his October 2019 release, Clayton absconded again from DOC supervision by removing his GPS ankle monitor. When DOC's critical response team arrested Clayton three days later, Clayton was possessing methamphetamines. Clayton was subsequently charged in King County and convicted of drug possession and failing to comply with community custody; he was sentenced to 14 months (possession) and 3 months (community custody violation) of confinement that ran concurrently and 12 months of community custody.

While Clayton served his sentence for these new convictions, DOC attempted to get Clayton placed in civil commitment as a sexually violent predator (SVP) given the concerning comments that he made before his 2019 release. A corrections officer sent a detailed screening report to the Attorney General's Office (AGO) to see if Clayton could meet the criteria for the program. However, apparently because of the nature of Clayton's new charges and the relatively short sentence, the AGO ultimately decided to pause the SVP process for Clayton to a later time.

B. 2021 COMMUNITY CUSTODY VIOLATION

In February 2021, after completing his King County sentence, Clayton was again placed on GPS monitoring for his ongoing community custody. In March 2021, Clayton admitted to his community corrections officer (CCO) that he had used methamphetamine and that his cell phone

3

had "child images and bestialities" downloaded onto it. CP at 80. A subsequent search of Clayton's phone revealed that he had done multiple searches for "rape," "adult aged porn[ography]," as well as sexually explicit images of children. CP at 80.

Clayton was arrested and detained. DOC gave Clayton's phone to Pierce County law enforcement for "review/investigation . . . for possible criminal charges." CP at 79. (Based on our record, it is unclear whether Pierce County filed criminal charges.) DOC also notified the AGO to see if Clayton's new violations were sufficient to revisit the possibility of having Clayton civilly committed as an SVP. The AGO determined that Clayton's conduct was not enough to meet the criteria for commitment.

DOC also took internal administrative actions following Clayton's admissions about his drug use and possession of images on his phone. DOC and Clayton agreed to a 14-day sanction, which was ultimately imposed by a hearings officer.

## C. CLAYTON'S ASSAULT OF MOORE

Clayton was released from this 14-day custody on March 25, 2021, with a GPS ankle monitor. But within 24 hours of his release, Clayton removed his ankle monitor and absconded. DOC immediately issued a warrant for Clayton's arrest.

Within hours of his escape, Clayton broke into an elderly woman's home and threatened to rape and kill her. A neighbor became concerned after observing unusual activities at the home and called 911. Deputy Moore responded to investigate. Clayton ambushed Deputy Moore when she arrived and stabbed her in the neck with a knife. Deputy Moore managed to shoot Clayton twice, in the leg and in the chest, before she lost consciousness.

II. Moore's Complaint Subsequent Proceedings

Two years later, Moore filed a lawsuit against DOC, alleging that DOC failed "to control a dangerous parolee, []Clayton, and prevent him from causing foreseeable harm to [Deputy] Moore." CP at 1. The complaint alleged six causes of action: (1) negligence or gross negligence, (2) negligent implementation of a release plan, (3) negligent hiring, training, and supervision, (4) failure to warn, (5) unlawful parole and conditional discharge, and (6) negligent infliction of emotional distress.

DOC moved for summary judgment. DOC argued that because Moore was injured by Clayton in the course of her duties as a law enforcement officer and "her injuries were the result of a danger inherent to her response to [an emergency] call," the professional rescue doctrine barred recovery for her injuries. Additionally, DOC argued that it had qualified immunity for its "quasi-judicial functions." CP at 25. Finally, DOC argued that even if the lawsuit was not procedurally barred, summary judgment was appropriate on the merits.

The superior court agreed with DOC and dismissed the complaint. Moore appeals.

ANALYSIS

Moore argues that the superior court erred when it granted DOC's motion for summary judgment. Among her arguments, she contends that the professional rescue doctrine should be rejected as a bar to her lawsuit. According to Moore, the doctrine violates the equal protection clauses of the federal and state constitutions and must be struck down.

Because the professional rescue doctrine would, if applicable, be a complete bar to Moore's lawsuit, we start our analysis there. However, because the doctrine was created by our Supreme Court, we, as an intermediate appellate court, decline to entertain Moore's constitutional

arguments. And once we apply the doctrine to these facts, Moore's complaint was properly dismissed.

## I. STANDARD OF REVIEW

We review a superior court's dismissal on summary judgment de novo. *Galassi v. Lowe's Home Ctrs., LLC*, 4 Wn.3d 425, 434, 565 P.3d 116 (2025). Summary judgment may be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Meyers v. Ferndale Sch. Dist.*, 197 Wn.2d 281, 287, 481 P.3d 1084 (2021). When reviewing a decision on summary judgment, we view all facts in the light most favorable to the nonmoving party. *Galassi*, 4 Wn.3d at 434.

## II. PROFESSIONAL RESCUE DOCTRINE

The professional rescue doctrine is court created; our Supreme Court recognized the doctrine in *Maltman v. Sauer*, 84 Wn.2d 975, 978, 530 P.2d 254 (1975). *Markoff v. Puget Sound Energy, Inc.*, 9 Wn. App. 2d 833, 840-41, 447 P.3d 577 (2019), *review denied*, 195 Wn.2d 1013 (2020). In *Maltman*, an army helicopter crashed while responding to an automobile accident, causing the deaths of two of the crew members. 84 Wn.2d at 976. Following the crash, the estates of the deceased crew members sued the motorist, alleging that the motorists' negligence had created the situation that had ultimately required their rescue. *See id.* at 976-977. On appeal, our Supreme Court held that because the crew members were acting within their duties as active army members and had been killed by hazards that were "inherently within the ambit of those dangers unique to and generally associated with [helicopter rescues]," they were barred from tort recovery. *Id.* at 979. The court explained that "professional rescuers" were distinct from voluntary rescuers

in that professional rescuers assumed certain foreseeable risks associated with their positions.  *Id.* at 978.

> Those dangers which are inherent in professional rescue activity, and therefore foreseeable, are willingly submitted to by the professional rescuer when [they] accept[] the position and the remuneration inextricably connected therewith. . . . Stated affirmatively, it is the business of professional rescuers to deal with certain hazards, and such an individual cannot complain of the negligence which created the actual necessity for exposure to *those* hazards.  When the injury is the result of a hazard generally recognized as being within the scope of dangers identified with the particular rescue operation, the [rescue] doctrine[1] will be unavailable to that plaintiff.

*Id.* at 978-79.

Following *Maltman*, Washington courts have consistently applied the professional rescue doctrine to bar recovery for professional rescuers.  *See, e.g.*, *Estate of McCartney v. Pierce County*, 22 Wn. App. 2d 665, 689, 513 P.3d 119, *review denied*, 200 Wn.2d 1014 (2022); *Loiland v. State*, 1 Wn. App. 2d 861, 865, 407 P.3d 377 (2017) ("The professional rescuer may not recover where 'the hazard ultimately responsible for causing the injury is inherently within the ambit of those dangers which are unique to and generally associated with the particular rescue activity.' " (quoting *Maltman*, 84 Wn.2d at 979)), *review denied*, 190 Wn.2d 1013 (2018); *see also Beaupre v. Pierce County*, 161 Wn.2d 568, 572, 166 P.3d 712, 715 (2007) ("Under the professional rescue doctrine, a professional rescuer may not recover for injuries stemming from hazards 'inherently within the

---

[1] The "rescue doctrine" should not be confused with the "professional rescue doctrine."  The "rescue doctrine" *provides for* tort recovery to a *non*-professional rescuer.  *Maltman*, 84 Wn.2d at 976-77 ("In a general sense the 'rescue doctrine' is intended to provide a source of recovery to one who is injured while reasonably undertaking the rescue of a person who has negligently placed [themselves]in a position of imminent peril.").  Whereas the "professional rescue doctrine" *bars* tort recovery to the professional rescuer.  *See id.* at 978.

ambit of those dangers which are unique to and generally associated with the particular rescue activity.' " (quoting *Maltman*, 84 Wn.2d at 979)). These subsequent decisions reaffirm *Maltman*'s rationale that the professional rescue doctrine is, at its core, "a type of implied primary assumption of the risk." *Beaupre*, 161 Wn.2d at 576.

Moore argues that the professional rescue doctrine should be rejected because it violates the equal protection clauses of our federal and state constitutions. According to Moore, the doctrine "plainly singles out professional rescuers as a class, denying them their fundamental right to seek redress for their personal injuries." Br. of Appellant at 66. Moore contends that there is no compelling state interest that would justify this infringement on a fundamental right, thus the professional doctrine cannot survive constitutional scrutiny.

Notwithstanding that *Maltman* does not expressly address the alleged constitutional defects raised by Moore, adoption of her position would require us to reject 50 years of jurisprudence from our Supreme Court. As an intermediate appellate court, it is well established that we are bound to follow the precedent set by our Supreme Court. *State v. Jussila*, 197 Wn. App. 908, 931, 392 P.3d 1108 (2017) ("We must follow Supreme Court precedent, regardless of any personal disagreement with its premise or correctness."), *review denied*, 191 Wn.2d 1019 (2018); *State v. Brown*, 13 Wn. App. 2d 288, 291, 466 P.3d 244 ("[A] decision by the Washington Supreme Court is binding on all lower courts of the state."), *review denied*, 196 Wn.2d 1013 (2020); *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984) ("[O]nce [the Washington Supreme Court] has decided an issue of state law, that interpretation is binding on all lower courts until it is overruled by [the Washington Supreme Court].").

Moore is essentially asking us to upend *Maltman* and all subsequent decisions that have flowed from it. We, like other courts before us, adhere to our Supreme Court's precedent. *See, e.g.*, *Gossett v. Farmers Ins. Co. of Wash.*, 82 Wn. App. 375, 390, 917 P.2d 1124 (1996) (declining to consider appellant's constitutional arguments that would "in effect . . . overrule" *Olympic Steamship Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 811 P.2d 673 (1991)), *rev'd*, 133 Wn.2d 954, 948 P.2d 1264 (1997); *cf.*, *State v. Higgins*, No. 88022-5-I, slip op. at 6 (Wash. Ct. App. Nov. 17, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/880225.pdf (declining to consider constitutional arguments to extend the temporal bounds set by our Supreme Court in *In re Pers. Restraint of Monschke*, 197 Wn.2d 305, 482 P.3d 276 (2021)). Once we leave the professional rescue doctrine untouched, it serves as a complete bar to Moore's complaint.

CONCLUSION

While responding to a welfare check, Deputy Moore was viciously ambushed by a dangerous individual. Our record suggests that Deputy Moore was nothing short of heroic as she managed to incapacitate Clayton and save an elderly woman from sexual violence (or death) before the deputy lost consciousness from her serious injuries. We commend her service in the face of an intensely dangerous situation.

But our Supreme Court has crafted the professional rescue doctrine, and that doctrine bars her lawsuit against DOC. We decline to disturb that precedent. Because the doctrine is a complete bar to her complaint, we need not review the remainder of Moore's claims on appeal. Accordingly, we affirm the superior court.

No. 60406-0-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

CRUSER, J.

CHE, J.