202 P.3d 372 (2009)
Roger PETERSON and Larae Peterson, husband and wife, Appellants,
v.
BIG BEND INSURANCE AGENCY, INC., a Washington Corporation, and a Washington Insurance Broker; and Grange Insurance Association, a Washington Association, and a Washington Insurer, Respondents.
No. 26734-2-III.
Court of Appeals of Washington, Division 3.
March 5, 2009.
*374 Jeffrey Lawrence Supinger, Attorney at Law, Spokane, WA, for Appellants.
Jennifer Lynn Campbell, Schwabe Williamson & Wyatt PC, Seattle, WA, Brad E. Smith, Ewing Anderson, P.S., Spokane, WA, for Respondents.
KULIK, A.C.J.
¶ 1 In September 2004, Roger and Larae Peterson obtained a home insurance policy from the Grange Insurance Association. Prior to obtaining the policy, the Petersons spoke to Jack McCalmant of Big Bend Insurance Agency, Inc. and explained their desire to have their home insured for the full replacement value. On November 27, 2004, the Petersons' home was destroyed by fire. The Grange paid the Petersons $193,000, which was the replacement value limit under their policy. The full replacement value of their home was $328,843.
¶ 2 The Petersons filed this action on several theories, including negligence, negligent misrepresentation, bad faith, and violations of the Consumer Protection Act (CPA), chapter 19.86 RCW. The trial court found that Mr. McCalmant agreed to provide an estimate of the replacement value using the Boeckh Cost Guide formula, which would have resulted in an estimated replacement value of $240,000 and an increase in personal contents coverage of $23,500. The court dismissed the bad faith and CPA claims against Big Bend and the Grange, and denied the Petersons' request for attorney fees. The Petersons appeal. We affirm the decision of the trial court, but we reverse the dismissal of the CPA claim against Big Bend. We remand for a calculation of damages and attorney fees.

FACTS
¶ 3 Jack McCalmant was an insurance agent and part owner of Big Bend Insurance Agency. On January 19, 2004, Mr. McCalmant met with the Petersons to determine whether the Petersons "wanted to stay with Big Bend or obtain their insurance coverage elsewhere." Clerk's Papers (CP) at 542. *375 Mr. McCalmant assured the Petersons that his agency would "`take care of business.'" CP at 542.
¶ 4 When discussing home insurance, Mr. McCalmant told the Petersons that they had replacement value coverage with a limit of coverage of $179,800. The Petersons explained that they wanted the house insured so that it could be replaced if it was destroyed. The Petersons indicated that they did not know what the cost of this coverage would be or how such a figure would be determined. Mr. McCalmant told the Petersons that his agency would use a formula that involved plugging in certain items, such as the square footage, the type of construction, and certain upgrades. Mr. McCalmant told the Petersons that he would handle this task for them.
¶ 5 The Petersons described their home to Mr. McCalmant. Mr. McCalmant told the Petersons that they were underinsured. The Petersons stressed their desire to have the home insured for its full replacement value. Ms. Peterson asked who would come up with the replacement number for the home. Mr. McCalmant told them that he would. He explained that he would go to their house, take measurements, gather other information, and plug the information into the formula to come up with the replacement number. Mr. McCalmant did not represent that he was an appraiser or a builder or that he had expertise in valuing real property or its replacement cost.
¶ 6 The formula used by Mr. McCalmant for determining replacement value was a computer software program designed by the E.H. Boeckh Company that is known as the Boeckh Cost Guide. Use of this software, or a similar program, is a standard in the insurance industry for determining the replacement value of homes. It was Big Bend's policy to use the Boeckh Cost Guide to estimate the cost to replace a home in the event of a total loss. The cost guide was not usually provided to the client, but Big Bend's agents would usually go over the report with the client when they discussed policies and renewals.
¶ 7 On June 8, 2004, Mr. McCalmant visited the Petersons' home to meet with the Petersons and to conduct his inspection. Mr. McCalmant inspected the outside of the home, took measurements and photographs, and prepared a diagram, but he did not enter the home. Mr. McCalmant told Mr. Peterson that they should increase the coverage on the home's contents from 50 percent of the home's replacement value to 70 percent.
¶ 8 Later, Jody Piper, a customer service representative for Big Bend, ran the cost guide formula on the Petersons' home using the information that Mr. McCalmant obtained from his inspection. Ms. Piper did not have the information from the standard Boeckh questionnaire and she did not have information about the home's numerous upgraded features which would have increased the replacement value. The Boeckh Cost Guide results for the Petersons' home established a basic replacement value of $219,103 with a location adjusted value of $223,463.
¶ 9 On June 21, 2004, Big Bend sent an insurance summary to the Petersons. The summary showed $193,000 as the replacement value coverage for the home. Big Bend also sent a cover letter advising the Petersons that if they wished to review their insurance coverage they should call and set up an appointment.
¶ 10 When Mr. Peterson received the insurance summary, he noticed the $193,000 replacement value figure, which was $14,000 more than the same coverage the prior year. Mr. Peterson assumed the $14,000 increase was the result of the updated calculation of the home's replacement cost based on the formula that Mr. McCalmant had explained. But the increase was actually due to an automatic inflation guard provision. Mr. Peterson signed the insurance summary on September 14. On November 27, the Peterson home caught fire and was totally destroyed.
¶ 11 The Grange assigned the claim to Dave Bean, a Grange field representative. Mr. Bean immediately met with Mr. Peterson and began an investigation. Mr. Bean employed Dave Anderson, a licensed real estate appraiser, to appraise the Petersons' home before the loss. Shortly after, the Grange issued a total of $10,000 in advancements *376 to the Petersons against the contents provisions of the policy.
¶ 12 On December 3, Mr. Bean met with Mr. Peterson for the second time to review coverage and the procedures for making claims. On December 28, the Grange sent a letter to the Petersons concerning the status of the claim. The letter asked the Petersons to prepare an inventory of personal items that were destroyed in the fire. The Petersons were informed that the appraisal was not yet complete, but that they should have a contractor or builder prepare a bid for the reconstruction of the home.
¶ 13 On January 5, 2005, the Petersons' attorney, Jeff Supinger, called Mr. Bean and requested copies of the policies. Mr. Supinger told Mr. Bean of his concern that the coverage limits on the Petersons' home had been undervalued. On January 21, Mr. Bean received the appraisal from Mr. Anderson. The appraisal placed a fair market value of $190,000 on the home based on a comparative sales analysis, and a new replacement value of $328,843.
¶ 14 Shortly after receiving the appraisal, Mr. Bean called Mr. Supinger to give him the figures. Mr. Supinger told Mr. Bean that he thought the Petersons' home was underinsured and that the Grange was to blame.
¶ 15 On January 27, the Grange sent $193,000 to Mr. Supinger for the Petersons. The Grange explained that this amount represented the replacement value policy limit. The Grange also sent a check of $5,560.25 to the Petersons to cover the cost of demolishing the damaged home. The Petersons submitted claims of $123,720.03 for personal property losses, but the Grange paid only $96,500, which was one-half of the $193,000 replacement limits of the home.
¶ 16 On January 27, Mr. Supinger sent a letter to Mr. Bean stating that $193,000 was "far too little to replace" the Petersons' home. Ex. 257. Mr. Supinger enclosed a copy of Schanz v. New Hampshire Insurance Co., 165 Mich.App. 395, 418 N.W.2d 478 (1988). In late January, the Petersons obtained a bid from a general contractor totaling $310,030.57. The Grange continued to reject the Petersons' claim for replacement costs in excess of $193,000.
¶ 17 The Petersons filed a complaint for negligence, negligent misrepresentation, breach of contract, bad faith, violation of the CPA, and attorney fees and costs. The matter was tried without a jury.
¶ 18 The court entered its memorandum decision and findings of fact and conclusions of law. With regard to the negligence action, the trial court concluded that Big Bend breached the duties assumed when Mr. McCalmant agreed to provide an estimate based on the cost guide formula. With regard to the negligent misrepresentation claim, the trial court concluded that Big Bend negligently provided the Petersons with false information by advising the Petersons as to how the replacement value would be calculated and then providing them with a figure that was not calculated that way. The court ruled that the Grange was vicariously liable for the damages.
¶ 19 The trial court calculated the damages as the difference between the $240,000, the cost guide estimate, and the $193,000 figure in the policy. This change increased the Petersons' coverage by $47,000 and their personal contents coverage by $23,500. The court dismissed the CPA and bad faith claims against Big Bend and the Grange and denied the Petersons' request for attorney fees. The Petersons appeal.

ANALYSIS
¶ 20 A trial court's findings will not be disturbed if there is substantial evidence to support them. Thorndike v. Hesperian Orchards, Inc., 54 Wash.2d 570, 575, 343 P.2d 183 (1959). Substantial evidence is evidence sufficient to persuade a fair-minded and rational person of the truth of the declared premise. Am. Nursery Prods., Inc. v. Indian Wells Orchards, 115 Wash.2d 217, 222, 797 P.2d 477 (1990). The deference accorded under the substantial evidence standard recognizes that the trier of fact is in a better position than the reviewing court to evaluate the credibility and demeanor of the witnesses. State v. Hill, 123 Wash.2d 641, 646, 870 P.2d 313 (1994).
*377 ¶ 21 If we determine that the evidence supports the findings, we must then consider whether the findings support the court's conclusions of law. See Landmark Dev., Inc. v. City of Roy, 138 Wash.2d 561, 573, 980 P.2d 1234 (1999). Questions of law and conclusions of law are reviewed de novo. See Mason v. King County, 134 Wash.App. 806, 810, 142 P.3d 637 (2006).
¶ 22 Using $240,000 as an Estimated Replacement Value. An insured may bring an action against his insurance agent in negligence as well as contract. Anderson Feed & Produce Co. v. Moore, 66 Wash.2d 237, 242, 401 P.2d 964 (1965). To recover against an insurance agent based on negligence, the insured must prove: (1) that the agent had a duty of care to protect the insured against a certain risk, (2) a breach of that duty, (3) that the breach was the proximate cause, (4) of the insured's damages. Doty-Fielding v. Town of S. Prairie, 143 Wash.App. 559, 563, 178 P.3d 1054, review denied, 165 Wash.2d 1004, 198 P.3d 511 (2008); see Sheikh v. Choe, 156 Wash.2d 441, 128 P.3d 574 (2006).
¶ 23 An insurance agent assumes only the duties found in an agency relationship unless the agent assumes additional duties by contract or by holding himself or herself out as possessing an extraordinary skill. Hardt v. Brink, 192 F.Supp. 879, 880-81 (W.D.Wash.1961) (applying Washington law). Generally, the duty of care that an insurance agent owes his or her client does not include the obligation to procure a policy affording the client complete liability protection. Suter v. Virgil R. Lee & Son, Inc., 51 Wash.App. 524, 528, 754 P.2d 155 (1988) (quoting Jones v. Grewe, 189 Cal.App.3d 950, 956, 234 Cal.Rptr. 717 (1987)).
¶ 24 Here, the Petersons informed Mr. McCalmant that they wanted replacement coverage but that they did not know how to obtain that figure. In response, Mr. McCalmant told the Petersons that he would run the cost guide formula and provide them with an estimate.[1] Mr. McCalmant assumed only the duty to provide an estimate based on the cost guide.
¶ 25 Big Bend breached its duties to the Petersons by (1) not utilizing the standard cost guide questionnaire to obtain accurate, detailed information from the Petersons, (2) not entering complete information about the home into the cost guide software, (3) not utilizing the formula to calculate replacement value limits on the home, and (4) not informing the Petersons that the cost guide formula was not used to estimate the home's replacement value for the policy.
¶ 26 The Petersons contend the court erred when defining the duty undertaken by Mr. McCalmant. They assert that Mr. McCalmant represented that he would provide a figure sufficient to fully replace their home. Specifically, the Petersons challenge the court's determination that Big Bend undertook a duty to the Petersons to: "(1) obtain important information about the home; (2) to input that information into the agency's `formula;' and (3) to provide the Petersons with a replacement value estimate based on that process." CP at 553.
¶ 27 However, the court's conclusion is supported by the findings. There was no evidence that Big Bend agreed to conduct a professional real estate appraisal or to obtain bids and consult builders or other experts to determine the full replacement value of the home.
¶ 28 Big Bend argues that the Petersons had a duty to advise Mr. McCalmant about the insurance coverage they wanted. Big Bend points out that this duty is described in cases such as Suter, Gates v. Logan, 71 Wash.App. 673, 676-77, 862 P.2d 134 (1993), and Sandbulte v. Farm Bureau Mutual Insurance Co., 343 N.W.2d 457 (Iowa 1984). For example, in Suter, the court stated that: "[I]t is the insured's responsibility to advise the agent of the insurance that he wants, including the limits of the policy to be issued." *378 Suter, 51 Wash.App. at 528, 754 P.2d 155. Gates also assigns the duty to determine policy limits to the insured stating: "Ordinarily the insured knows the extent of his personal assets and ability to pay increased premiums better than the insurance agent." Gates, 71 Wash.App. at 677, 862 P.2d 134. Similarly, in Sandbulte, the court concluded that asking for "sufficient coverage" did not support an expanded agency agreement. Sandbulte, 343 N.W.2d at 465.
¶ 29 However, Suter, Gates, and Sandbulte are not dispositive here because they did not involve a specific promise by an agent as part of the agency relationship. Here, Mr. McCalmant promised to provide the Petersons with an estimate of replacement coverage based on the cost guide formula. While the Petersons had a duty to determine the amount of coverage, Mr. McCalmant agreed to provide them with a cost guide estimate so that they could make this determination.
¶ 30 The Petersons next argue that the trial court erred by concluding that Mr. McCalmant undertook only to run a cost guide analysis and then by using $240,000 as the estimated replacement value of their home. The Petersons assert that Mr. McCalmant undertook to provide them with full replacement value coverage of $328,000.
¶ 31 The trial court did not err by using the $240,000 figure from the cost guide as the estimate of the home's replacement value. The evidence establishes that Mr. McCalmant agreed to provide an estimate based on the cost guide formula. The evidence does not support the assertion that Mr. McCalmant agreed to obtain full replacement coverage for the Petersons.
¶ 32 The Petersons assert that the $240,000 figure is unreasonable because it leaves them underinsured in the amount of $86,000. This argument is unpersuasive. Mr. McCalmant agreed to run the cost guide formula; he did not agree to obtain a full replacement cost policy for the Petersons. The fact that the Petersons are underinsured for $86,000 does not enhance or change the nature of the duty undertaken by Mr. McCalmant. Moreover, unchallenged finding of fact 18 states that the cost guide, or a similar formula, is the industry standard.
¶ 33 The Petersons contend the trial court erred by adopting a figure  $240,000  that was not calculated by anyone at the time of the transaction. We disagree. The court based its award of damages on the duty undertaken by Mr. McCalmant. The court was not limited to only those figures known to the Petersons.
¶ 34 Lastly, the Petersons maintain that the use of the $240,000 figure is unreasonable because it is less than 80 percent of the full replacement cost and would trigger the co-insurance penalty. The use of the $240,000 figure is reasonable because Mr. McCalmant undertook to run the cost guide formula. There was no evidence that Big Bend was aware of any deficiencies in the formula or that any co-insurance penalty was asserted or applied.
¶ 35 In short, the court's findings that Mr. McCalmant agreed to run the Petersons' numbers through the cost guide formula is supported by substantial evidence. The court's findings support the court's conclusions that the Petersons' damages should be based on the $240,000 figure obtained through the application of the cost guide formula.
¶ 36 Negligent Misrepresentation. The trial court also found the Petersons established their claim of negligent misrepresentation. A person who commits the tort of negligent misrepresentation is:
"One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."
Lawyers Title Ins. Corp. v. Baik, 147 Wash.2d 536, 545, 55 P.3d 619 (2002) (emphasis added) (quoting ESCA Corp. v. KPMG Peat Marwick, 135 Wash.2d 820, 826, 959 P.2d 651 (1998)). Significantly, liability may be imposed on an insurance agent for making *379 negligent misrepresentations as to how policy limits are to be determined where the client justifiably relies on the representations. Shah v. Allstate Ins. Co., 130 Wash.App. 74, 84-85, 121 P.3d 1204 (2005).
¶ 37 The court's findings and conclusions related to the negligent misrepresentation claim focus on the information that was provided to the Petersons. Conclusion of law 60(4), provides: "[Big Bend] did not inform the Petersons that the Boeckh Cost Guide or `formulas' was not used in estimating the home's replacement value." CP at 553. Conclusion of law 61 states that: "In initially advising the Petersons as to how the replacement value would be determined, and then thereafter providing them with a replacement value limit that was not calculated in this manner, Big Bend negligently provided their clients with false information." CP at 553.
¶ 38 The Petersons argue that the court erred in finding of fact 12 which states that Mr. McCalmant's representations were consistent with Big Bend's office policies and advertising. But finding of fact 12 is irrelevant. There is no evidence that the Petersons relied upon, or even knew of, Big Bend's advertising or policies.
¶ 39 The court properly concluded that the Petersons proved their claim of negligent misrepresentation by showing that Big Bend provided a figure for replacement value that was not based on the cost guide formula.
¶ 1140 CPA Claim Against Big Bend. To prevail on a claim under the CPA, chapter 19.86 RCW, a plaintiff must show that the defendant engaged in "(1) an unfair or deceptive act or practice (2) in trade or commerce (3) that impacts the public interest, (4) which causes injury to the party in his business or property, and (5) which injury is causally linked to the unfair or deceptive act." St. Paul Fire & Marine Ins. Co. v. Onvia, Inc., 165 Wash.2d 122, 134, 196 P.3d 664 (2008) (citing Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wash.2d 778, 784-85, 719 P.2d 531 (1986)). Significantly, RCW 48.30.010 prohibits those engaged in the business of insurance from engaging in unfair trade practices.
¶ 41 The Petersons contend that Big Bend engaged in an unfair or deceptive practice by violating RCW 48.30.090, which states, in part, that no person shall "make, issue or circulate, or cause to be made, issued or circulated any misrepresentation of the terms of any policy." (Emphasis added.)
¶ 42 The trial court determined that Big Bend did not misrepresent the limits of the Petersons' replacement value coverage for purposes of a CPA claim. The court concluded that Big Bend's negligent misrepresentation did not fall within the prohibitions of RCW 48.30.090 because Big Bend's negligent misrepresentation did not relate to the limits of the replacement coverage or any other term in the policy, but, instead, related to how this particular term was determined. The court explained that Big Bend did not misrepresent the limits of the policy because the insurance summary clearly stated the limit as $193,000.
¶ 43 The Petersons argue that they requested coverage sufficient to replace their home and that Big Bend represented that this would be done. The Petersons point out that the trial court found that it was a "reasonable assumption"[2] for Mr. Peterson to assume that the $14,000 increase in the replacement figure on the insurance summary was the result of the recalculation of the home's replacement value using Mr. McCalmant's formula.
¶ 44 The Petersons rely on Shah. The Shahs bought a house for $760,000 to use as a rental property. A bank lent them $400,000, and required them to purchase insurance. The Shahs contacted an insurance agent and told him to send the bank whatever was needed. An appraisal estimated the total value of the building at $760,995. However, when the agent entered the information from the appraisal into a cost estimator program, he made a mistake when entering the square footage. The estimator program generated an insurance value of $307,000. Shah, 130 Wash.App. at 78, 121 P.3d 1204. Later, Mr. Shah asked the agent why the amount *380 on the policy was low when another company gave him a quote based on $700,000. The agent assured Mr. Shah that he had replacement value. When the building burned in a fire, Allstate paid $330,000. Id. at 79, 121 P.3d 1204.
¶ 45 The Shahs filed suit, alleging negligent misrepresentation, violation of the CPA, and other claims. On summary judgment, the court found the Shahs did not rely on the agent with respect to the misrepresentation claim. The appellate court reversed, concluding that there was a genuine issue of material fact as to whether the Shahs' reliance on the agent was justified and whether the agent violated the CPA. Specifically, there were questions whether the agent's assurances to Mr. Shah caused the Shahs not to raise their limit and whether the agent caused damages by not communicating with the bank about its minimums. Id. at 86, 121 P.3d 1204.
¶ 46 In Shah, the agent assured the Shahs that the policy provided replacement value for the building. Id. at 84, 121 P.3d 1204. Here, Mr. McCalmant undertook to provide the Petersons with an estimate of replacement value based on the cost guide formula. But Mr. McCalmant did not do so. He sent the Petersons false information, the $193,000 term, that they relied on in making their decision to insure.
¶ 47 The court found that Big Bend negligently provided the Petersons with false information when it provided them with a replacement limit that was not calculated under the cost guide formula. As a result, the $193,000 figure in the policy was false because it was not based on the cost guide formula. The Petersons justifiably relied on this false information to their detriment. By providing the $193,000 figure to the Petersons, Big Bend misrepresented the terms of the policy to the Petersons and violated RCW 48.30.090. The trial court erred by concluding that Big Bend did not misrepresent the limits of the replacement coverage.
¶ 48 To establish a violation of the CPA, the Petersons must also meet the public interest prong. The public interest prong is satisfied by "a showing that a statute has been violated which contains a specific legislative declaration of public interest impact." Hangman Ridge, 105 Wash.2d at 791, 719 P.2d 531. RCW 48.01.030 states that the business of insurance is affected by the public interest. Thus, a misrepresentation about the Petersons' coverage was a matter impacting the public interest. See Shah, 130 Wash.App. at 87, 121 P.3d 1204.
¶ 49 The court erred by dismissing the Petersons' CPA claim against Big Bend. The Petersons have established their CPA claim against Big Bend.
¶ 50 CPA Claim Against the Grange. The Petersons contend the trial court erred by dismissing their CPA claim against the Grange. They assert that the Grange failed to timely and reasonably investigate their claim.
¶ 51 WAC 284-30-300 through WAC 284-30-410 govern unfair claims settlement practices and applies to all insurance contracts and policies. WAC 284-30-300, -310. It is "an unfair method[] of competition and unfair or deceptive act[] or practice[]," to fail "to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies" or to refuse to pay a claim without conducting a reasonable investigation. WAC 284-30-330(3), (4). "In other words, an insurer must make a good faith investigation of the facts before denying coverage and may not deny coverage based on a supposed defense which a reasonable investigation would have proved to be without merit." Indus. Indem. Co. v. Kallevig, 114 Wash.2d 907, 917, 792 P.2d 520 (1990).
¶ 52 The trial court rejected the Petersons' argument that the Grange violated WAC 284-30-440 and WAC 284-30-370. Instead, the trial court concluded that the Grange properly investigated and settled the Petersons' fire loss claim. Here, the Petersons challenge finding of fact 45 and conclusion of law 68. Finding of fact 45 reads:
[The] Grange had continually rejected the [Petersons'] claim for replacement costs in excess of $193,000. The basis of this rejection was their position that $193,000 was the replacement value limit under the policy, *381 that the Petersons were legally responsible for determining the amount of their replacement value coverage, that the insurance company has no duty to determine coverage amounts or limits, and that the Petersons never requested any coverage above the $193,000 amount. [The] Grange did not actively investigate the [Petersons'] claims of negligent appraisal, as they felt this question was not legally relevant to the adjustment of the [Petersons'] claims.
CP at 548.
¶ 53 Conclusion of law 68 reads:
[The] Grange reasonably relied on the decision in Suter v. Virgil R. Lee and Son, Inc., and its progeny in taking its position, and was reasonable in taking the position the Michigan case of Schanz v. New Hampshire Insurance Co. was contrary to Washington law. Likewise, the case of Shah v. Allstate was not published at the time [the] Grange was investigating and adjusting the [Petersons'] loss, and [the] Grange had a good faith argument to distinguish that decision from the present case.
CP at 555.
¶ 54 The Petersons contend that the Grange failed to investigate their claim, even when the Grange was put on notice that the Petersons' home had been undervalued. In the Petersons' view, the Grange should have conducted an investigation into the replacement value issue immediately after being contacted by the Petersons' attorney.
¶ 55 On January 21, the Grange received the appraisal valuing the Petersons' home at $328,843. On January 27, Mr. Supinger sent another letter, and included a copy of Schanz, explaining that this case recognized an action for "negligently performed appraisal." Ex. 257. In reviewing this case, Jack Barker at Grange made notes that "[Mr. Supinger] encloses a Michigan case.... Odd that he doesn't cite and [sic] Washington case but I assume this is because there are none in the insureds favor.... [A]gent has said he had a hard time convincing the insureds to increase the limits when he took over this piece of business." Ex. 242 at AL003027-28. In Schanz, the insureds contacted their insurance agent to obtain replacement cost value coverage for an office building that was later destroyed by fire. The insurance agent used an incorrect appraisal to obtain insurance through a replacement cost value insurance policy. Schanz held that, while an insurer who does not undertake to inspect an insured's premises has no duty, an insurer who preformed an inspection and an appraisal owes a duty of reasonable care when determining the replacement cost coverage for its insured. Schanz, 165 Mich.App. at 404-05, 418 N.W.2d 478.
¶ 56 The Petersons maintain that Schanz was in harmony with Washington law because Schanz was based on Restatement (Second) of Torts § 323 which had also been applied in Estes v. Hammerstad, 8 Wash. App. 22, 25-26, 503 P.2d 1149 (1972). In Estes, the appellate court affirmed the trial court's conclusion that a real estate firm was liable for damages sustained when the purchasers' home was destroyed by fire. The trial court found that the real estate broker had agreed to prorate the fire insurance policy between the purchasers and the sellers, to notify the insurance company of the change in ownership, and to transfer the policy to the purchasers. Estes, 8 Wash.App. at 23-26, 503 P.2d 1149.
¶ 57 While Estes involved a specific promise, at the time of the investigation, the Grange had no knowledge that Mr. McCalmant had undertaken to provide the Petersons with an estimate of the replacement value of their house. Moreover, nothing in Mr. Supinger's letters alerted the Grange to this possibility. More importantly, at the time the Grange was investigating the Petersons' loss, Suter  Washington law, not Michigan law  applied. Here, the court correctly held that the Grange took a reasonable position when it concluded that Schanz was contrary to Washington law.
¶ 58 The Petersons contend the court erred by concluding that Shah had not been published and that the Grange had a good faith argument to distinguish Shah from the present case. This argument is without merit. The Petersons' home burned in November 2004 and the Grange was investigating the claim in January 2005. The Petersons *382 filed this action on July 1, 2005. Shah was decided on September 12, 2005, and publication was ordered on October 25. Shah, 130 Wash.App. at 74, 121 P.3d 1204.
¶ 59 The trial court did not err by dismissing the Petersons' CPA claim against the Grange.
¶ 60 Bad Faith Claim. The Petersons also contend the trial court erred by denying their request for attorney fees. They assert an award of attorney fees was proper under Olympic Steamship Co. v. Centennial Ins. Co., 117 Wash.2d 37, 811 P.2d 673 (1991).
¶ 61 Generally, Washington follows the American rule as to attorney fees. The American rule provides that attorney fees are not recoverable by a prevailing party unless the recovery is permitted by contract, statute, or some recognized ground of equity. Leingang v. Pierce County Med. Bureau, Inc., 131 Wash.2d 133, 143, 930 P.2d 288 (1997). However, Olympic Steamship held that
an award of fees is required in any legal action where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract, regardless of whether the insurer's duty to defend is at issue.
Olympic Steamship, 117 Wash.2d at 53, 811 P.2d 673 (emphasis added).
¶ 62 Here, the trial court denied the Petersons' request for fees under Olympic Steamship, concluding there was no authority for such an award. The court determined that Olympic Steamship allowed for an award of reasonable attorney fees "in a legal action to compel the insurer to provide benefits available under the insurance contract," but not here where the action was based on negligence and misrepresentation. CP at 556. The court concluded it had no legal authority to award attorney fees in an action involving an insurance agent's negligence and an insurer's vicarious liability.
¶ 63 The Petersons argue that an award of fees is proper here because the controversy involved a dispute over insurance coverage. The Petersons assert the Grange was bound by the negligent misrepresentation of its insurance agent and must provide that amount of coverage. To support their argument, the Petersons cite Leingang. However, Leingang did involve an issue of coverage; the issue was whether an exclusion was enforceable. Leingang, 131 Wash.2d at 147, 930 P.2d 288. Hence, Leingang, like Olympic Steamship, involved a question over the benefits extended in an insurance contract. Here, the action is based on negligence and misrepresentation.
¶ 64 The Petersons also argue their claim is a coverage claim, based on the definition of "coverage" contained in Kroeger v. First National Insurance Co., 80 Wash.App. 207, 908 P.2d 371 (1995). Kroeger states: "`Coverage means the assumption of risk of occurrence of the event insured against before its occurrence.'" Id. at 210, 908 P.2d 371 (quoting Ryan v. Cuna Mut. Ins. Soc'y, 84 Wash.2d 612, 615, 529 P.2d 7 (1974)). In the Petersons' view, their claim is a "risk assumed" claim and the contract issue is what risk the Grange policy covered. Appellant's Br. at 45.
¶ 65 The court correctly denied an award of attorney fees to the Petersons. The Grange paid the $193,000 owed under the policy and the Petersons' action was based on negligence and misrepresentation, not contract.
¶ 66 We affirm the decision of the trial court, but we reverse the dismissal of the CPA claim against Big Bend and remand for a calculation of damages and attorney fees. We also award attorney fees and costs on appeal.
WE CONCUR: SWEENEY and BROWN, JJ.
NOTES
[1] The Petersons challenge finding of fact 11 which reads, in part: "[Mr.] McCalmant explained to the Petersons that the use of this formula would result in a reasonable estimate of their home's replacement value, and that he would handle this task for his clients." CP at 542. Based on this record, there is no support for the court's use of the word "reasonable" in finding of fact 11. However, this change has no effect on our resolution of this case.
[2] CP at 546.