IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JENNIFER L. HABU and RICHARD Y. CHINN, husband and wife, | ) ) ) | No. 79152-4-I |
| Appellants, | ) ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| CONRADO A. TOPACIO (also known as Conrad A. Topacio and Conrado Jesus Topacio), individually; CARRIE L. TOPACIO (also known as CARRIE LYNN FIELD), individually; the marital community of CONRADO A. TOPACIO and CARRIE L. TOPACIO; HENRY L. JACKY, individually; JENNIFER E. JACKY, individually; the marital community of HENRY L. JACKY and JENNIFER E. JACKY; JAMES P. KOORY, individually, and the marital community of JAMES P. KOORY and CRYSTAL B. KOORY; SANDRA E. TUREK, individually; CHJ PROPERTIES LLC, a Washington limited liability company; CHJ FOOD SERVICES LLC, a dissolved Washington limited liability company; DALAWA LLC, a Washington limited liability company doing business as Vantage Commercial Partners; GREEN SKY NW LLC, a Washington limited liability company doing business as Mari J's Highway Pot Shop; JESSICA ELIZABETH-ANN JORDAN, individually; MERCHANTS BONDING COMPANY (MUTUAL), a surety bond company registered in the State of Washington; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

No. 79152-4-I/2

GEORGINA GAIL LUKE (also known
Ginger Luke), individually and the marital
community comprised of her and HANS
JAKOB LUECK,

                    Respondents.

                FILED: February 3, 2020

HAZELRIGG-HERNANDEZ, J. — Jennifer Habu and Richard Chinn seek reversal of an order enforcing a CR 2A term sheet drafted after a two-day mediation. They contend that the term sheet was not a final expression of all material terms of the settlement and therefore they are not bound by the document. Because the term sheet does not fix all of the material obligations of all parties, we reverse.

## FACTS

The underlying dispute in this case arose from the purchase and sale of a commercial property in Everett, Washington. In 2014, Jennifer Habu and Richard Chinn sold the property to CHJ Properties, a limited liability company owned by Conrad Topacio, Henry Jacky, and James Koory. Habu and Chinn alleged that the defendants defrauded them during the sale of the property, thereby discouraging other buyers and causing Habu and Chinn to accept less than the fair market value of the property as a purchase price.

In late 2017, Habu and Chinn brought suit against Conrad Topacio, Carrie Topacio, Henry Jacky, Jennifer Jacky, James Koory, Crystal Koory, CHJ Properties LLC, CHJ Food Services LLC, and Dalawa LLC (collectively, CHJ); Sandra Turek and Merchants Bonding Company (collectively, Merchants); and Green Sky NW LLC and Jessica Jordan (collectively, Green Sky). The complaint

- 2 -

detailed claims for fraud, negligence, negligent misrepresentation, violations of the Consumer Protection Act[1] and Criminal Profiteering Act,[2] breach of contract, unjust enrichment, equitable indemnification, recovery of remedial action costs under the Model Toxics Control Act (MTCA),[3] and a request for declaratory relief.

The parties engaged in a two-day mediation in February 2018. The negotiation resulted in the drafting of a document entitled "CR 2A Term Sheet" by Habu and Chinn's counsel. The document provided that the defendants would immediately withdraw their pending motions for summary judgment, for more definite statement, and to dismiss under CR 12(b)(6), and that "[t]he parties agree to memorialize and use their best efforts to fully execute a final Settlement Agreement within thirty (30) days of the mediation."

The term sheet listed the following provisions that the settlement agreement "shall contain." Habu and Chinn would receive a "$200,000 initial settlement payment" within 60 days of the effective date of the agreement. On receipt of the "$200,000 portion of the settlement funds," Habu and Chinn would dismiss all of their claims against all parties with prejudice, except the claims against CHJ under the MTCA, which would be dismissed without prejudice.

After CHJ obtained an appraisal of the property and Habu and Chinn compiled environmental reports for the property, "the property shall be listed with a mutually agreeable listing agent." Habu and Chinn were to be kept informed of any inquiries or offers to purchase the property, and "[a]ll purchase and sale terms

---

[1] Chapter 19.86 RCW.
[2] Chapter 9A.82 RCW.
[3] Chapter 70.105D, 82.21 RCW.

shall be subject to the Plaintiffs' approval, including but not limited to the sales price. In the course of the negotiations, the parties will act in good faith." The term sheet also stated that:

> 17. Upon closing, any debt owed to 9506 LLC [4] (and for which 9506 LLC is not requested to carry the note) shall be paid in full, and the first $350,000 of the sale proceeds over and above the debt repayment shall be paid to Plaintiffs. The balance of any net sale proceeds shall be disbursed to CHJ Properties LLC.

Habu and Chinn were not to be responsible for any sale commissions. If the property did not sell within two years of listing, the remaining parties would be free to assert their MTCA claims against each other.

The parties agreed to return to mediation in the event that a dispute arose while negotiating the final settlement agreement and "to make a good faith effort to mediate and resolve those disagreements or disputes." Additionally, the term sheet stated that "[a]ll parties executing this Term Sheet represent and warrant that they have authority to sign on behalf of the person or entity upon whose behalf they are signing." It also contained a provision that "[t]he final Settlement Agreement shall be signed by each of the parties before an independent notary public unaffiliated with any of the parties." The term sheet was signed by all parties except Green Sky NW LLC and Jessica Jordan, with Henry Jacky signing on behalf of his wife, Jennifer Jacky, and James Koory signing on behalf of his wife, Crystal Koory.

Over the next six months, the parties exchanged drafts of a final settlement agreement based on this term sheet but were unable to agree on terms related to

---

[4] In September 2016, 9506 LLC purchased CHJ's loan from Coastal Community Bank. 9506 LLC is owned by Habu and Chinn but is not a party to the case.

- 4 -

paragraph 17 of the term sheet. CHJ contended that the $350,000 post-sale payment was contingent on the property selling for a sufficient price, while Habu and Chinn wanted to write the payment into the final agreement as an unconditional obligation.

CHJ filed a motion to enforce the CR 2A term sheet, which Merchants and Green Sky joined. Habu and Chinn submitted declarations in opposition to the motion to enforce the term sheet asserting that they did not intend the term sheet to be binding when they signed it and did not understand the $350,000 payment to be conditioned on the proceeds of the sale being sufficient to cover the sum. In an order setting an evidentiary hearing on the motion, the court indicated that it would "apply summary judgment procedures to determine whether there is a genuine dispute regarding the existence and/or material terms of the CR 2A agreement." It also ruled that "[n]o party may file or serve additional briefing or materials in support of or in opposition to the Motion to Enforce prior to the evidentiary hearing without leave of Court." The court clarified that the parties would be permitted to present material facts through live testimony at the hearing if they desired but noted "that it is unlikely that the Court would allow the parties to try to introduce into evidence through live witnesses any documents or other materials that have not already been filed and served in connection with the motion to enforce."

At the hearing, Habu and Chinn attempted to introduce a statement of facts to which they and Merchants had stipulated concerning other negotiated documents that had been signed at the mediation with the documents attached as

- 5 -

exhibits. They noted that the stipulation had been prepared as a substitute for Merchants' live testimony because those defendants were not present at the hearing. CHJ objected, and the court ruled that it would not consider the stipulation because all parties had not agreed to permit it to be filed and the court had not granted leave to consider the additional documents.

The court granted the motion to enforce the CR 2A term sheet. The court found that the parties had entered into a binding CR 2A settlement agreement that did not impose an unconditional obligation on CHJ to pay Habu and Chinn $350,000. The court also ordered the parties to enter into a long-form settlement agreement consistent with the CR 2A agreement. Habu and Chinn moved for reconsideration, which was denied. Habu and Chinn appealed. Merchants and Green Sky joined in CHJ's opening brief to this court.

## ANALYSIS

Habu and Chinn argue that the court erred in finding the term sheet to be binding and enforceable. They contend that the term sheet was not final as a matter of law because on its face it contemplates negotiation of additional material terms and future dispute resolution.

I.    Standard of Review

When a moving party relies on affidavits or declarations to show that a settlement agreement is not genuinely disputed, the trial court follows summary judgment procedures. Condon v. Condon, 177 Wn.2d 150, 161, 298 P.3d 86 (2013). Accordingly, the party moving to enforce an alleged agreement bears the

-6-

burden to prove that there is no genuine dispute as to its existence and material terms. Id. at 162. The court reads the parties' submissions in the light most favorable to the nonmoving party to determine whether reasonable minds could reach only one conclusion. Id. "[I]f the nonmoving party raises a genuine issue of material fact, a trial court abuses its discretion if it enforces the agreement without first holding an evidentiary hearing to resolve the disputed issues of fact." Brinkerhoff v. Campbell, 99 Wn. App. 692, 697, 994 P.2d 911 (2000).

"Appellate courts give deference to trial courts on a sliding scale based on how much assessment of credibility is required; the less the outcome depends on credibility, the less deference is given to the trial court." Dolan v. King County, 172 Wn.2d 299, 311, 258 P.3d 20 (2011). When the trial court makes a decision based on written documents and is not required to "'assess the credibility or competency of witnesses, and to weigh the evidence, nor reconcile conflicting evidence,'" we review the decision de novo. Id. at 310 (quoting Progressive Animal Welfare Soc'y v. Univ. of Wash., 125 Wn.2d 243, 252, 884 P.2d 592 (1994)). When the court hears live testimony, we review findings of fact for substantial evidence, recognizing that the trial court is able to assess the credibility and demeanor of testifying witnesses in a manner not afforded to appellate courts reviewing the cold record. Garofalo v. Commellini, 169 Wash. 704, 705, 13 P.2d 497 (1932); Peterson v. Big Bend Ins. Agency, Inc., 150 Wn. App. 504, 514, 202 P.3d 372 (2009).

Here, the trial court ordered an evidentiary hearing after the parties submitted their initial written arguments and declarations. None of the parties presented live testimony at the evidentiary hearing. The court ultimately resolved

the issue based on the arguments of counsel and declarations submitted with the briefing. Although the court entered its findings after an evidentiary hearing, the court relied entirely on written submissions in making these findings. Because of this and because the parties do not dispute the standard of review, we review the trial court's order on the motion to enforce de novo.

II.    Enforceability of CR 2A Term Sheet

The common law of contracts applies to settlement agreements. Condon, 177 Wn.2d at 161. Washington follows the objective manifestation theory of contracts. Hearst Commc'ns., Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). For a contract to form, the parties must objectively manifest their mutual assent to be bound and the terms assented to must be sufficiently definite. Keystone Land & Dev. Co. v. Xerox Corp., 152 Wn.2d 171, 177–78, 94 P.3d 945 (2004). "[W]e attempt to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." Hearst, 154 Wn.2d at 503. The parties' subjective intent is generally irrelevant if we can determine their intent from the reasonable meaning of the words used. Id. at 504. Whether there was mutual assent is normally a question of fact but may be determined as a matter of law where reasonable minds could reach but one conclusion. Keystone, 152 Wn.2d at 178 n.10.

An informal agreement may be "sufficient to establish a contract even though the parties contemplate signing a more formal written agreement" in certain circumstances. Morris v. Maks, 69 Wn. App. 865, 869, 850 P.2d 1357 (1993). To determine whether the informal agreement is enforceable, we "consider whether

- 8 -

(1) the subject matter has been agreed upon, (2) the terms are all stated in the informal writings, and (3) the parties intended a binding agreement prior to the time of the signing and delivery of a formal contract." Id. (citing Loewi v. Long, 76 Wash. 480, 484, 136 P. 673 (1913)). "[I]f a term is so 'indefinite that a court cannot decide just what it means, and fix exactly the legal liability of the parties,' there cannot be an enforceable agreement." Keystone, 152 Wn.2d at 178 (quoting Sandeman v. Sayres, 50 Wn.2d 539, 541, 314 P.2d 428 (1957)).

Habu and Chinn cite Keystone in support of their argument that a contract was not formed because the parties expressly left terms open to future resolution. In Keystone, the Washington Supreme Court considered whether Washington contract law would recognize and enforce an implicit or explicit agreement between two or more parties to negotiate a future contract. Id. at 173–74.

The Keystone court explained the differences between three similar types of agreements. Id. at 175. The first was an agreement to agree, which is not enforceable in Washington. Id. at 175–76. "An agreement to agree is 'an agreement to do something which requires a further meeting of the minds of the parties and without which it would not be complete.'" Id. (quoting Sandeman, 50 Wn.2d at 541–42). The second type was an agreement with open terms, under which "the parties intend to be bound by the key points agreed upon with the remaining terms supplied by a court or another authoritative source." Id. at 176. The third was a contract to negotiate:

> In a contract to negotiate, the parties exchange promises to conform to a specific course of conduct during negotiations, such as negotiating in good faith, exclusively with each other, or for a specific period of time. Under a contract to negotiate, the parties do not intend

to be bound if negotiations fail to reach ultimate agreement on the substantive deal. In contrast to an agreement to agree, under a contract to negotiate, no breach occurs if the parties fail to reach agreement on the substantive deal. The contract to negotiate is breached only when one party fails to conform to the specific course of conduct agreed upon.

Id. (internal citations omitted).

Keystone contended that an exchange of letters between its broker and Xerox's broker created an enforceable contract to negotiate and commitment to prepare a purchase and sale agreement because "all of the key terms of the substantive agreement were settled." Id. at 174–75. The court found that Keystone had not identified "an offer and acceptance to be bound to specific standards of negotiating conduct" sufficient to form a contract to negotiate. Id. at 178.

Here, unlike Keystone, the term sheet did contain explicit agreements to "use . . . best efforts to fully execute a final Settlement Agreement within thirty (30) days of the mediation" and "negotiate in good faith." This language arguably created an enforceable contract to negotiate on those terms. However, as Keystone makes clear, a contract to negotiate is not breached by failure to agree on substantive provisions.

The Keystone court also determined that the statements made by Xerox's brokers did not amount to an unconditional commitment to prepare the purchase and sale agreement. Id. at 178–79. Xerox's brokers stated that "'Xerox is prepared to negotiate a Purchase and Sale Agreement with Keystone Development subject to two modifications to your Proposal,'" and, if Keystone acknowledged acceptance of the modifications to its proposal, "'[w]e can then proceed immediately to draft the Purchase and Sale Agreement for review and execution.'" Id. (emphasis

- 10 -

omitted). The court found that the statements did not create an unconditional commitment:

> At most, the statement is a manifestation of Xerox's intention to negotiate with Keystone. There is no objective manifestation by Xerox of an intent to be bound if Keystone accepts the modifications. See Pac. Cascade Corp. v. Nimmer, 25 Wn. App. 552, 556, 608 P.2d 266 (1980) (holding an intention to do something "is evidence of a future contractual intent, not the present contractual intent essential to an operative offer"). On the contrary, the statement evidences an intent not to be bound by expressly referencing the need for further negotiations. See Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 72 (2d Cir. 1989) (holding "reference to a binding sales agreement to be completed at some future date" is evidence of a present intent not to be bound).
>
> . . . .
>
> Keystone asks us to imply a duty to continue negotiations until a final agreement is reached. In fact, Keystone argues that the question before us is not whether the parties agreed to an enforceable duty to negotiate. Instead, it argues the question is "whether the negotiations between Keystone and Xerox had advanced to the point where the law should impose on the parties a 'duty to go forward [.]'" We decline to create and impose a duty to go forward in the absence of an enforceable contract. No contract was formed between Keystone and Xerox. At best, the circumstances of this case present an implied agreement to agree.

Id. at 179–80 (emphasis omitted).

Keystone is not precisely analogous to the factual situation in this case. Unlike the more informal exchange of letters in Keystone, here, the parties signed a term sheet drafted after two days of settlement negotiations. However, like Keystone, the document expressly references the need for further negotiations on certain terms, such as "a reasonable, mutual nondisparagement provision."

Also, although the term sheet contains many specific provisions that are to be included in the final settlement agreement, it is silent on a number of important issues. The term sheet does not explicitly state which defendants would be

responsible for the $200,000 initial payment to Habu and Chinn or what would happen if the sale proceeds were insufficient to provide for the $350,000 payment to Habu and Chinn. It also does not address the disposition of the property if it is not sold within two years of listing or whether the $350,000 would still be owed. All of the timelines within which the parties must act run from the effective date of the final settlement agreement. It is also notable that the order enforcing the term sheet simply directs the parties to enter into a long-form settlement agreement. This seems to indicate that the term sheet obligated the parties only to engage in further negotiation.

Viewed in the light most favorable to Habu and Chinn as the nonmoving parties, the term sheet appears to be an unenforceable agreement to agree. The court erred in finding the term sheet to be a binding and enforceable settlement agreement and granting the motion to enforce the CR 2A term sheet.

Because we find the term sheet to be unenforceable, we need not consider Habu and Chinn's other assignments of error regarding the court's refusal to consider extrinsic evidence, the interpretation of paragraph 17 of the term sheet, and whether CR 2A prevented enforcement of the agreement. Habu and Chinn also request an award of costs on appeal. "A commissioner or clerk of the appellate court will award costs to the party that substantially prevails on review, unless the appellate court directs otherwise in its decision terminating review." RAP 14.2. We will leave this issue in the capable hands of our commissioner or clerk.[5]

---

[5] Habu and Chinn filed a statement of additional authority containing a citation to an online news article from the Everett Herald describing the outcome of a criminal case involving

Reversed.

WE CONCUR:

_____

_____
Andrus, J.

_____
Leach, J.

---

some of the parties. CHJ moved to strike the statement of additional authority. Habu and Chinn filed a response to the motion to strike and CHJ filed a reply. After considering the briefing of both parties, the motion to strike is granted.